The PEOPLE of the State of South Dakota in the Interest of J.J. and S.J., Children and Concerning V.J., Grandmother.

Nos. 16217, 16669 and 16672.

Supreme Court of South Dakota.

Argued Sept. 13, 1989.

Decided April 4, 1990.

Mark L. Bratt, Asst. Atty. Gen., Pierre, Roger A. Tellinghuisen, Atty. Gen., on the brief, for appellee, State of S.D.

Kenneth E. Jasper, Rapid City, for children.

Larry D. Plank, Black Hills Legal Services, Rapid City, for mother.

G. Verne Goodsell, Rapid City, for father.

Frank A. Bettmann of Bettmann & Feehan, Rapid City, for grandmother.

B.J. Jones, Dakota Plains Legal Services, Fort Yates, N.D., for Standing Rock Sioux Tribe.

MORGAN, Justice.

This proceeding comes before us as the consolidation of three separate appeals from the actions of the trial court with regard to the termination of custodial rights in two minor Indian children, S.J. and J.J. (children). It being undisputed that the children are of Indian blood, the provisions of 25 U.S.C. Chap. 21, the Indian Child Welfare Act (Act) are implicated.

Reference to specific sections of the Act will be denominated thus: § _____.

Appeal # 16217 arose from the order terminating the custodial rights of V.J., children's grandmother (V.J.); appeal # 16669 arose from the order denying transfer of jurisdiction to the Tribal Court of the Standing Rock Sioux Tribe (Tribe); and appeal # 16672 arose from the order permitting Tribe to intervene herein.

In addition to the number of issues involved, it is noteworthy that these children have been in the system for a period of over five years. S.J., born March 24, 1982, is now over seven years of age and J.J., born May 4, 1983, is now over six years of age. During most of their lifetimes, the children have resided in Rapid City, South Dakota, and have never lived on any Indian reservation. They do not speak Lakota or any Indian language. While this appeal has been pending, children have resided in the state of New York with their proposed adoptive parents. The adoptive father is a full-blooded American Indian and an enrolled member of the Iroquois Nation.

A brief review of the procedural background of this case is appropriate. The Department of Social Services (DSS) commenced the proceedings with a petition for dependency and neglect in August, 1984. From early in the proceedings, the trial court was provided with information that these children were not enrolled in any tribe. D.C., the children's birth father, is enrolled at the Rosebud Sioux Tribe (Rosebud). Notice was sent to Rosebud; however, a letter from that tribe indicated that J.J. was not eligible for enrollment in the tribe and declined transfer of jurisdiction. Rosebud further indicated that the children were eligible for enrollment in the Oglala Sioux Tribe (Oglala) and suggested it be contacted. Notice was sent to Oglala who petitioned for transfer of the proceedings, stating that R.J., the children's birth mother (Mother), was an enrolled member of that tribe. However, Mother objected to the transfer[1] and the trial court retained jurisdiction.

In anticipation of the initial hearing in these proceedings, by stipulation dated April 22, 1985, the birth parents and V.J. stipulated that children were dependent and neglected and that legal custody of the children could be given to DSS. The stipulation provided further that, subject to completion of various programs, physical custody of J.J. would be returned to parents and physical custody of S.J. would be placed with V.J. The trial court entered an order in conformity with the stipulation. From the record it appears that this order governed for about six months, at which time J.J. was also placed with V.J. Subsequently both birth parents *voluntarily* terminated their parental rights to children, placing sole custody, care and control in DSS with full adoptive rights: Mother in proceedings held in March, 1986; father in proceedings held in March, 1987.

DSS continued the placement of both children with V.J., towards the goal of her adoption of the children, until January 1, 1987, when S.J. was brutally raped to such an extent that she required corrective surgery. During DSS' subsequent investigation of the rape, other facts came to light[2] which indicated that the environment in V.J.'s home rendered her unsuitable as the adoptive parent of the children and both children were removed from her physical custody.

In response, in July, 1987, V.J. petitioned that the dispositional order giving DSS adoptive authority be set aside upon the grounds of violation of her due process rights as "custodian" of the children, when she did not receive notice of the proceedings terminating father's parental rights in accord with § 1912(a). The trial court, for reasons discussed later, reopened the proceedings for an additional dispositional hearing which lasted six days and, thereafter, entered a final dispositional order

---

1. Pursuant to § 1911(b), "[T]he court, in absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, *absent objection by either parent* [.]" (Emphasis added.)

2. The facts will be discussed at some length in the discussion of V.J.'s appeal.

terminating any custodial rights V.J. may have had and giving DSS adoptive authority. That order is the basis for V.J.'s appeal # 16217.

On October 26, 1988, when briefing on V.J.'s appeal was nearly complete, Tribe, apparently at the instigation of V.J., filed with this court a motion to intervene and requesting transfer of the matter to tribal court. This court remanded the case to the trial court for an evidentiary hearing on the motion. After the hearing, the trial court granted Tribe's motion to intervene but denied the motion to transfer. The denial of transfer is the basis for Tribe's appeal # 16669 and the grant of intervention is the basis for the children's notice of review, # 16672. On May 10, 1988, after children had filed their notice of review, we granted leave to all parties to file additional briefs on the new issues raised by Tribe and children.

V.J. raises four issues on appeal, which we will review in the following order, to-wit:

(1) The trial court lacked jurisdiction due to the failure to notify her of the child custody proceedings in conformity with § 1912(a).

(2) There is insufficient evidence to support the trial court's findings as required by § 1912(f).

(3) DSS failed to provide remedial services and rehabilitative programs to prevent the disruption of the placement in conformity with § 1912(d).

(4) The removal of the children was improper under the provisions of § 1920.

■ In the first issue, V.J. contends that the trial court lacked jurisdiction due to DSS' failure to give proper notice, particularly notice to her, as the "Indian custodian"[3] of the children, of the March, 1987, proceeding, wherein the parental rights of their father were terminated and DSS was given adoptive authority. She also makes an assertion that the entire proceedings from the inception are void because of lack of proper notice to Tribe. That issue is

also raised by Tribe in their appeal # 16669, and we will reserve discussion of that aspect of her appeal until we reach the discussion of the tribal appeal.

The notice requirements of the Act, found in § 1912(a) provides in pertinent part:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or *Indian custodian* and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. (Emphasis added.)

Factually, it appears that V.J. became a party to the proceedings as a Respondent, represented by counsel of record, back in early 1985, when the initial dependency and neglect hearing was scheduled relating to the children. At that time, a trial on the issue was waived. The parents, by their counsel of record at that time, and *V.J., by her counsel of record,* stipulated that the children were dependent and neglected and that legal custody of the children could be given to DSS. The stipulation further provided for evaluation of the parents and V.J. for chemical dependency and a minimum course of treatment if the evaluator deemed it appropriate. The physical custody of S.J. was placed in V.J. and the physical custody of J.J. was left with Mother. Subsequently, however, physical custody of J.J. also went to V.J.. Physical custody of both children was given to V.J. by DSS, *not* by either of children's parents.

On March 24, 1986, a dispositional hearing was heard on Mother's parental rights and resulted in termination. The record does not reflect that V.J. was a party to, or received notice of, that proceeding. But V.J. made no issue of it, so we consider that to be waived. The record reflects that proceedings were had regarding the termination of father's parental rights and re-

---

**3.** Section 1903(6) defines "Indian Custodian" as "any Indian person who has legal custody of an Indian child under Tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child[.]"

sulted in an order of termination directing that the children be placed with V.J. for adoption subject to further hearing if the adoptive placement is unsuccessful. That order was dated the 14th day of January, 1987, nunc pro tunc December 24, 1986.

Prior to the actual entry of that order, and while both children were apparently in V.J.'s care, S.J. was brutally raped and abused on January 1, 1987. Further investigation by DSS disclosed that J.J. had likewise suffered physical and sexual abuse while in V.J.'s care. DSS removed the children from V.J.'s home and secured a court order setting aside the January 14, 1987, order and setting further dispositional proceedings. Such proceedings were held on March 5, 1987, resulting in another final dispositional order dated May 7, 1987, nunc pro tunc March 5, 1987, placing the children with DSS with full adoptive rights. Because she apparently was not notified of the January, 1987, and March, 1987, proceedings for termination of father's parental rights, V.J., in July 1987, petitioned the court to set aside that portion of the father's termination order that specifically allowed adoption of the children and requested that she again be given physical custody of the children and preference in adoption in conformity with the Act. She has raised no issue as to the propriety of the termination of father's parental rights.

The trial court determined that notice of the termination proceedings should have been given to V.J. for three reasons: (1) she was a named respondent in the initial proceedings; (2) she was a member of the children's extended family; and (3) she was the "Indian custodian" of the children. Since we agree that she should have received notice at the dispositional level, because she was a named respondent in the proceedings at the dependency and neglect level, we need not discuss the other two reasons, which we do not necessarily agree with. The trial court set aside that portion of the termination order that permitted adoption, but left the custody of the chil-

dren in DSS, pending further hearing on V.J.'s custody and adoption rights.

A very extensive hearing was held on V.J.'s petition for custody and adoptive preference.[4] The trial court's memorandum opinion gave rise to findings of fact and conclusions of law and a final order terminating V.J.'s custodial rights and denying her any preference for adoption. Inasmuch as V.J. was afforded her hearing, although she did not attain the results that she sought, we determine that the notice issue, as to V.J., is rendered moot.

V.J.'s second issue, sufficiency of the evidence to support the trial court's findings, implicates § 1912(f), which provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

We are also mindful of our scope of review. A trial court's findings of fact cannot be set aside unless they are clearly erroneous and, after a review of all the evidence, we are left with a definite and firm conviction that a mistake has been made. *Matter of Dependency and Neglect of A.L.*, 442 N.W.2d 233 (S.D.1989); *Matter of J.L.H.*, 316 N.W.2d 650 (S.D.1982); SDCL 15–26A–10. "A trial court's conclusion of law may be reviewed and set aside only when the trial court has erred as a matter of law." *A.L.*, 442 NW2d at 235. Again, it is noteworthy that V.J. has not questioned the termination of the parental rights of either of the birth parents of the children. She only contests the trial court's abrogation of her priority for adoption of the children as an extended family member.

V.J. relies on two provisions of the Act to support her claim of priority to custody of the children. They are § 1915(a), which provides, in pertinent part:

---

**4.** The facts raised in the hearing and the arguments on the outcome will be discussed in a later issue.

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; . . .[5]

and § 1915(b), which provides, in pertinent part:

In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family[.]

"In the absence of good cause to the contrary" is the dispositive language in this case. This requires some factual review covering the period that V.J. had the children in her custody by virtue of placement by DSS and as directed by the dispositional order of January 14, 1987, nunc pro tunc December 24, 1986. The children had been placed with V.J., in accordance with the Act, with the intention that she adopt her grandchildren. That much to be desired plan was changed when S.J. was brutally raped in V.J.'s home.

The evidence in the record regarding the rape incident is very well summed up in the trial court's memorandum decision[6] dated the 14th day of December, 1987, as follows:

On New Year's Day, 1987, Officer Blenner of the Rapid City Police Department, was called to the [J] home on an emergency call placed by [V.J.]. When the officer arrived at the door, an intoxicated and apparently unconcerned woman, later identified as [V.J.], nodded toward the back of the house and said, "The problems back there." The officer was reluctant to enter the home on such cryptic information, but nonetheless ventured into the back bedroom. There she saw a small girl bleeding profusely from the vagina. In the room were [V.J.'s] son [G.] and two older females. That morning [V.J.] had thrown [G.] out of the house for having a woman in his bedroom. He returned later that afternoon. When asked at the hospital, four and one-half year old [S.J.] said in the presence of [V.J.] and Doctor Burnett, "[G.] did it." Two physicians, a gynecologist and a pediatrician, examined [S.J.] and concluded to a reasonable medical certainty that she had been sexually assaulted. The doctors repaired a two inch gash along the vaginal opening. Despite these medical conclusions and despite the fact that [G.] was the only male in the home at the time the assault occurred, [V.J.] refuses to even brook the notion that [G.] sexually assaulted [S.J.]. "[G.] does not lie," says [V.J.], and that ends the matter for her. To make matters worse, [grandmother] intimates that if similar events occurred in the future, she would still have to believe [G.].

In addition to the specifics of the rape incident, the trial court's memorandum decision makes specific mention of the following highly relevant facts:

1. V.J. has a long history of intermittent alcohol abuse.

2. V.J. repeatedly entrusted the children to persons wholly unfit to care for them. Both children were sexually abused while in V.J.'s custody by another uncle B.C. (k/a "Bimbo") as well as by G.

3. Both children were being physically abused while in V.J.'s custody. J.J. has permanent scars from burns on her buttocks which appear to be inflicted. She also had black and blue marks on her body, which she said

---

5. We note, however, that the trial court complied with the Act's third level of priority by placing children with an Indian family. Section 1915(a) provides:

In any adoptive placement of an Indian child under state law, a preference shall be given in the absence of good cause to the contrary, to a placement with

(1) a member of the child's extended family;

(2) other members of the Indian child's tribe; or

(3) other Indian families.

The trial court determined that DSS' placement with the present Indian family best meets the individual needs of children after considering relative placement.

6. Incorporated by reference in the findings of fact and conclusions of law of February 11, 1988, nunc pro tunc December 5, 1987.

grandmother caused by hitting her with a shoe.

4. V.J. also permitted their birth mother, R.J., to take the children in a car when she knew that R.J. was likely to abuse alcohol.

5. Both R.J. and G. now live with grandmother. G. is violent and uncontrollable when intoxicated, as he was on January 1, 1987. V.J. concedes that G. dislikes S.J. and J.J. because "they get on his nerves."

6. V.J. refuses to believe that she or her son played any part in the injuries to the children.

V.J. relies on the failure of the State to prosecute G. for any offense arising out of the New Year's Day event, but we are not persuaded. The exercise of prosecutorial discretion by the Pennington County State's Attorney, for whatever reason he might have had, does not change the shocking facts of the brutal injuries inflicted on a four and one-half year old child as determined by the trial court. The issue is not that G. raped the child, but the fact that the child was raped in V.J.'s home, while in V.J.'s custody and while V.J. was intoxicated.

■ V.J. also attacks the trial court's decision as not being supported by evidence beyond a reasonable doubt. Section 1912(f). It is true that the trial court's dispositional findings of fact and conclusions of law of February 11, 1988, nunc pro tunc December 5, 1987, states generally that the State has demonstrated the essentials of its case "by clear and convincing evidence." The finding, however, goes on to refer to the memorandum decision, which had already been incorporated by reference. That memorandum opinion, after citing the appropriate statutory burden of proof, "beyond a reasonable doubt," detailing the factual findings as previously mentioned above, states in its decision No. 3: "The court finds beyond a reasonable doubt that returning the children to [V.J.'s] custody would result in serious emotional and physical damage." In light of the factual determinations of the trial court, as we have previously set them out, we are con-

vinced that the trial court did apply the proper standard of review beyond a reasonable doubt and the reference to clear and convincing evidence was an inadvertent scrivener's error. *People in Interest of S.R.*, 323 N.W.2d 885, 887 (S.D.1982).

We next examine the record to determine if the State met the burden of providing qualified expert witnesses. In this regard, we note that two pediatricians, Doctors Donald Oliver and Willis Sutliff, who respectively had twelve years' and fifteen years' experience in the field, testified to the extensive bruising and scarring on J.J. Doctor Oliver testified that, in his opinion, the lesions were nonaccidental and were inflicted. Doctor Sutliff testified that S.J. had told him that G. had injured her and had previously touched and pinched her vagina many times.

Dr. Raymond Burnett, a specialist in obstetrics and gynecology, testified at length to his treatment of S.J., whom he first encountered in the hospital emergency room on January 1, 1987. He testified that in his opinion, based on experience, V.J., who was present, was intoxicated. After testifying to the history taken and the treatment afforded in surgery, the doctor testified that in his opinion S.J.'s injury was caused by trauma directed to the opening of the vagina, most likely from a penis trying to penetrate the vagina. He completely discounted the possibility that it was caused by falling from an automobile or a bicycle or tricycle as had been variously suggested to the investigators by V.J.

Tom Collins (Collins), a child protection supervisor in the DSS, was asked his opinion of the likelihood of serious physical or emotional damage resulting to the children in the event of their placement with V.J. Collins had been a child protection worker for one year and a supervisor for the three years preceding trial. He approximated that he had worked with around twelve hundred cases of child abuse in Indian families. He demonstrated his familiarity with Indian culture and unique factors in Indian heritage. He further testified that he had received training in the Act and had been called upon to testify as an expert in re-

gard thereto. *See Matter of K.A.B.E.*, 325 N.W.2d 840 (S.D.1982) (one social worker had BA in social work and contact with Indians on a regular basis; 30% of another social worker's time spent with Indian children at children's resource center); *Matter of Welfare of T.J.J.*, 366 N.W.2d 651 (Minn. App.1985) (psychologists were experts who had course work in Indian culture and one had experience working with Indian youth). Based upon the foregoing foundation, Collins testified, without objection:

> I would be in great fear of the children's emotional well being in addition to their physical well being. The trauma of coming into a situation where offenders are present, that being people that have taken indecent liberties with young children that are in the environment still would be. I feel that case would exist in [V.J.'s] home. I feel that [Mother] is still, if not in the home, in the area. I am aware that [B.C.] is in the area and I feel that it would provide significant trauma to the children. The additional concern I have in this case is the fact that [Mother] does continue to spend a great deal of time in [V.J.'s] home and the confusion that would present of having dealt with the loss of a natural parent and have that parent pop in and out of their daily lives. The record is clear that V.J. has allowed [Mother] to take the children from her home and that in itself would be confusing. To vision (sic) the small children living with a natural mom wondering, am I coming back or am I going back with natural mom and the confusion would be quite significant.

Collins further testified regarding his opinion of the care that V.J. was affording the children while they were with her, as follows:

> The statements regarding discipline of the children and the conditions testified to by the doctors that there were burns, other types of burns on the child, [J.J.'s] buttocks and that had to take place while the children were in [V.J.'s] care. The other thing that continues to astound me about this case is that we have seen evidence that states that the children were sexually assaulted on at least three

and probably more occasions in 1986, and you listened to the testimony by the foster mom about the sexual acting out the children were doing, it would seem to me that [grandmother] would have picked up on that sexual acting out and became as concerned as the foster mother and brought it to the appropriate people's attention so those issues could have been resolved. That puts me in a position to think that [V.J.] was not tuning into the needs of the children and not aware about the developmental issues that were present.

Ruth Gibson, foster mother for the children immediately after they were removed from V.J.'s home, also testified. Her testimony related to the girls' behavior after their arrival and after they were in the home long enough to feel settled. She described the physical conditions as previously related by the doctors and told of finding head lice on S.J. She described the games they played:

> A  Well, it wasn't normal three or four year olds play for one thing, and their play when they came to us was playing that they were going to go to the liquor store to buy liquor and cigarettes and afterwards to have a party and later call the cops on whoever was drunk and that was their play.
>
> Q  Did they play any other types of things they observed in the home?
>
> A  Yes, they had two imaginary friends and they would lay down with them and pretend that they were sleeping with them.
>
> Q  Were they male or female?
>
> A  Male friends.

Mrs. Gibson also testified as to statements made by the girls regarding frequent sexual contacts by their uncles G. and B.C. S.J. told her that "Grandma told her to tell that, that she had fallen out of a car, but she said I really didn't. I got hurt by G." We find that the testimony in the record, summarized above, more than adequately reflects qualified expert opinions that the continued custody of the children by V.J. is

likely to result in serious emotional or physical damage to the children. *K.A.B.E., supra; T.J.J., supra.*

We are aware of the Act's intent of preserving traditional Indian culture, values, home life and child rearing. *Mississippi Band of Choctaw Indians v. Holyfield,* —— U.S. ——, ——, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29, 38 (1989). These are laudible objectives that should be carried out. But home life at V.J.'s, consisting as it did of child molesting, beatings with shoes, sadistic burnings, and alcohol abuse, is certainly not the traditional Lakota culture that the Act seeks to preserve. *Matter of S.D.,* 402 N.W.2d 346, 351 (S.D.1987) (children should not be abused, neglected, or forlorned under the guise of cultural identity); *see also* Pommerscheim, The Reservation as Place: A South Dakota Essay, 34 S.D.L.Rev. 246, 250–51 (1989) for a discussion of traditional Lakota culture.

■ V.J.'s third issue, that DSS failed to provide remedial services and rehabilitative programs to prevent the disruption of the placement, would be farcical, if the situation were not so serious. The keystone upon which her issue is premised is found in § 1912(d), which provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Based on the arguments in her brief, V.J. apparently complains that *after the children were removed from her home* as a result of the January 1, 1987, incident, DSS did not make any further attempt to remedy the situation. In view of V.J.'s attitude supporting her son, G., the perpetrator of the offense against S.J., which attitude the trial court made specific mention of, we are at a loss as to what programs DSS could have provided either before or after the rape that would have remedied the situation. The record is replete with the attempts of DSS and the court to remedy this family situation. In fact, that is one of the principal reasons that this case has dragged in the court system for such a long period of time. Attempts were made to help Mother overcome her chemical dependency and alcoholism. Even after Mother's rights were voluntarily terminated, V.J. permitted her, drunk or sober, to have access to the children. *Matter of S.D., supra* (where aid and counsel provided by social services proves unavailing, termination is justified); *In re P.B.,* 371 N.W.2d 366 (S.D.1985) (Act is met if state shows that active efforts made to provide familial remedial services, and that they have failed); *see also State ex rel. Juvenile Dep't v. Charles,* 70 Or.App. 10, 15, 688 P.2d 1354, 1359 (1984), *review denied* 299 Or. 341, 701 P.2d 1052 (1985); *T.J.J., supra.* We are unaware of any program, nor does V.J. suggest any, that would remedy Uncle G.'s hostility and sexual aggression toward the children so as to prevent recurrence of the prior tragic event.[7] V.J. says that the *entire* burden is upon the DSS. In that she is wrong. *Matter of S.D., supra; In re P.B., supra.* The Act was not designed to protect her at the expense of the children. We find that, beyond a reasonable doubt, DSS made the requisite efforts to prevent the breakup of the family and that those efforts proved sadly unsuccessful in this case through no fault of DSS.

V.J. frames her final issue in the language of § 1920, which provides in pertinent part:

> Where any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian ... the court shall decline jurisdiction over such petition and shall forthwith

---

7. In fact, several studies suggest that child molesters such as G. and B.C. are not curable and have a high recidivism rates. Groth, Longo & McFadin, Undetected Recidivism Among Rapists and Child Molesters, 28 Crime & Delinquency 450, 457 (1982); Romero and Williams, Recidivism Among Convicted Sex Offenders: A 10–Year Follow-up Study, 49 Federal Probation 58, 69 (1985); Marshall & Barbaree, An Outpatient Treatment Program for Child Molesters, 528 Annals of the New York Academy of Sciences 211 (Prentky & V. Quinsey ed. 1988).

return the child to his parent or Indian custodian unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger.

■ V.J. asserts, and it is uncontestable, that on January 1, 1987, she had physical custody of the children. Her argument on this issue is two-fold. First, it is her position that when DSS removed the children she was entitled to notice and hearing under the provisions of SDCL 26–8–19.2. We are not in agreement. The adjudicatory phase of the proceedings had been accomplished, the children had been found to be dependent and neglected. V.J.'s custody was through the DSS. Granted, S.J. was covered by a stipulation; nevertheless, custody was in DSS with placement with V.J. under conditions. V.J. had actual notice that the children were being taken into DSS custody. She was present when it happened. She ultimately had a hearing upon her petition, as we have discussed in detail in issue two. We consider this aspect of her argument moot also.

V.J.'s second position is that, since the trial court failed to enter any findings of fact and conclusions of law under the provisions of § 1920, the decision must be reversed. To buttress this position, she argues that any findings or conclusions under the standard of § 1912(f), "likely to result in serious emotional or physical damage," do not equate to the standard of § 1920, "substantial and immediate danger." V.J. cites us to no case authority for that proposition, nor are we aware of any. In our view, the findings of the trial court as to the physical and emotional injuries sustained by both children demonstrate that a return of custody to V.J. would subject them to substantial and immediate danger.

Since we do not view the removal of the children to have been improper, we determine that the provisions of § 1920 are not applicable to this proceeding.

We now examine Tribe's issues in appeal # 16669, and children's notice of review issue in appeal # 16672.

Tribe raises two issues:

Whether failure to notify the Tribe of the proceedings deprived the trial court of jurisdiction?

Whether the trial court erred in denying transfer of the proceedings to tribal court?

By notice of review, the children raise the concomitant issue:

Whether the trial court erred in granting intervention.

There are two important facets of this case that must be kept in mind during this discussion. First, as we have previously noted, these children were not and never have been residents on the Standing Rock or any other Indian reservation or wards of any tribal court. They have spent the whole of their lives in Rapid City or its environs and, most recently, with their proposed adoptive parents in the state of New York. Thus, the provisions of § 1911(a), granting exclusive jurisdiction to a tribe where children are residing or domiciled within the reservation, are not applicable. *See generally Holyfield, supra.* Second, the parental terminations were voluntary under the provisions of § 1913.

■ Tribe's argument on the first issue is rather anomalous. First, it is argued that Tribe was entitled to notice of the proceedings in accord with § 1912(a). Then, a footnote is appended, which reads:

3. If this Court concludes that notice was required to be served upon the Tribe, as the Tribe argues herein, such a holding would not vitiate the termination of the parents' rights because such termination was voluntary, pursuant to 25 U.S.C. § 1913. The notice provisions if (sic) 1912(a) did not therefore apply.

We first review a bit of the background of this aspect of the proceedings. In August, 1988, after V.J. was unsuccessful in state court, she contacted Tribe to enroll her daughter, the children's mother, in Tribe. At V.J.'s urging, Tribe became aware of the child custody proceedings in state court. On October 26, 1988, Tribe moved to intervene and requested transfer of the child custody proceedings. Mother did not become an enrolled member of

Tribe until December 8, 1988. At the transfer hearing, Tribe presented evidence of Mother's enrollment and that children were thus eligible for enrollment with Tribe.

Tribe contends that failure by the trial court to notify it of these child custody proceedings violates § 1912(a) and deprives this court of jurisdiction. *In re N.A.H.*, 418 N.W.2d 310 (S.D.1988). Tribe premises this argument on its belief that its relationship to its children is as sacrosanct as that of any blood relative's and is entitled to protection under the law, and then makes a broad general argument on notice requirements supported by authorities that support § 1912(a) cases. DSS responds that § 1912(a) notice is not required in a § 1913(a) proceeding and that the trial court is bound by the Oglala Tribe's acknowledgment of tribal affiliation of Mother and eligibility of the children for membership in that tribe. *See In re Junious M*, 144 Cal.App.3d 786, 792, 193 Cal.Rptr. 40, 43 (1983); *State ex rel. Juvenile Department of Lane County v. Tucker*, 76 Or. App. 673, 710 P.2d 793 (1975); Guidelines for State Courts; Indian Child Custody proceedings (Guidelines), 44 Fed.Reg. 67,586 ¶ B.1.(b)(i).

■ We find both arguments persuasive. As to the requirement for notice, Tribe has acknowledged that it was not entitled to notice of the parental termination as a § 1913(a) proceeding. *See* Trentadue and DeMontigny, The Indian Child Welfare Act of 1978: A Practitioner's Perspective, 62 N.D.L.Rev. 486, 513n.159 & 160 (1986) (notice is required only in involuntary proceedings); Barsh, The Indian Child Welfare Act of 1978: A Critical Analysis, 31 Hastings L.J. 1287, 1313 (1980). While Tribe does not specifically so state, the only possible involuntary proceedings involved herein was the termination of V.J.'s custody. Section 1912(a) does provide that, in involuntary proceedings, the child's parents or Indian custodian and the Indian child's tribe shall be notified. The question then becomes: Was Tribe entitled to notice of that proceeding? We think not. Tribe cites no authority for its position, and for good rea-

son. Because V.J. was not an Indian custodian, there was no parental rights to terminate in an involuntary proceeding. This issue brings up the question of whether the trial court erred in determining that V.J. stood in the relationship of Indian custodian. The term "Indian custodian" is defined in § 1903(6):

> 'Indian custodian' means any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child.

As we earlier alluded to in discussing V.J.'s notice issue, we did not agree with the trial court's determination that V.J. was entitled to notice as Indian custodian. We determined there that her right to notice was founded on the fact that she was and had been a named party. We now specifically hold that she does not qualify as Indian custodian of the children. Case law makes it clear that absent custody given by *parents*, a person does not qualify as a "custodian" under the Act. *State ex rel. Juvenile Depart. v. England*, 292 Or. 545, 640 P.2d 608 (1982) (aunt without legal custody not entitled to notice under Act); *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983) (aunt without legal custody not an Indian custodian). Clearly, V.J. had no legal custody under tribal law or custom. The DSS placement of the children with V.J. did not transfer legal custody, which DSS retained. Finally, the temporary physical care, custody and control that she did have rested solely on the DSS placement, not on parental transfer.

■ We also agree with DSS' argument that the trial court was bound by the original determination of the Oglala that they were the children's tribe and sought intervention. *Junious M, supra; Tucker, supra;* Guidelines, 44 Fed.Reg. 67,586 ¶ B.1.(b)(i). Section 1911(d) mandates that we accord full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity. For the trial

court to have delved below this determination would have interfered with the Oglala's prerogative to determine membership. *Junious M,* (tribe's prerogative to determine membership); *Tucker, supra;* Guidelines, 44 Fed.Reg. 67,586 ¶ B.1.(b)(i); Cohen, Handbook of Federal Indian Law 133 (1942); *Barsh,* 31 Hastings L.J. at 1325. Furthermore, § 1903(5)(b) makes it clear that only one tribe can be a child's tribe. *See* Tellinghuisen, The Indian Child Welfare Act of 1978: A Practical Guide with [Limited] Commentary, 34 S.D.L.Rev. 660, 673 (1989); Trentadue & DeMontigny, 62 N.D.L.Rev. at 515. At the time that notice was sent to the Oglala and they sought transfer, it was known that children's maternal grandfather was a member of and 9/16ths blood quantum of the Oglala, their paternal grandmother was a member of and 4/4ths blood quantum of the Oglala. While V.J., the maternal grandmother, was a member of and 4/4ths blood quantum of the Standing Rock Sioux Tribe and was a party to the proceedings, she raised no question as to the proper notice then or after her daughter had blocked transfer. The objection to transfer did not dispute the Oglala claim of tribal membership. In short, V.J. did nothing about Tribe's participation until she lost her custody fight and then sought to bring in Tribe by enrolling her daughter as a member. Guidelines, 44 Fed.Reg. 67, 584–91 at 590, Commentary to Guideline C.1. (Nov. 26, 1979), argues against such improper manipulation:

> If a transfer petition must be honored at any point before judgment, a party could wait to see how the trial is going in state court and then obtain another trial if it appears the other side will win. Delaying a transfer request could be used as a tactic to wear down the other side by requiring the case to be tried twice. The Act was not intended to authorize such tactics and the 'good cause' provision is ample authority for the court to prevent them.

*See also* Trentadue & DeMontigny, 62 N.D. L.Rev. at 520. Tribe disclaims the trial court's presumption that it is engaged in an effort to assist V.J. in getting her grandchildren returned to her. Actually, the trial court found that "V.J. has resorted to the Standing Rock Sioux Tribe to find a way to get these children; she hopes the Standing Rock Sioux Tribe will return them to her." The record clearly supports the finding as to V.J.'s acts and motives. The trial court did not attribute any ulterior motives to Tribe's motions for intervention and transfer, nor, do we. But it is beyond peradventure that V.J. is using Tribe to seek her own ends, all to the detriment of the children.[8]

■ Lastly, we address Tribe's second issue: Whether the trial court erred in denying transfer. Section 1911(b) provides in part:

> In any State court proceedings for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the contrary,* shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[.] (Emphasis added.)

Although "good cause to the contrary" is not defined in the Act, the legislative history states that the term was designed to provide State courts with flexibility in determining the disposition of a child custody proceeding involving an Indian child. S.Rep. No. 597, 95th Cong., 1st Sess. 17 (1977), U.S.Code Cong. & Admin.News 1978, p. 7530.

After an evidentiary hearing on the remand, the trial court entered detailed findings of fact and conclusions of law which we summarize as follows: (1) all the evidence necessary to decide the case could not be adequately presented in tribal court without undue hardship to the parties or witnesses involved; (2) the minor children have had little or no contact with Tribe; (3)

---

8. The record reflects that as early as January, 1987, V.J. knew of an Indian tribe's ability to intervene and attempted to have the Oglala Sioux Tribal Court assist her. As mentioned earlier, this was properly blocked by the children's birth mother.

the children's "great need for a stable and secure environment greatly outweighs the minimal contacts" with Tribe; and (4) to remove these children from their adoptive home "would cause them terrible physical and emotional injury, and result in irreparable harm to these minor children." Therefore, the trial court concluded, good cause was shown not to transfer these proceedings to tribal court.

Tribe contends that the trial court erred on all these grounds. DSS contends that the trial court was correct on all these grounds, particularly that the court may consider the "child's best interests" in determining whether good cause exists to deny transfer. The judgment of the trial court will be upheld if it is right for any reason. *A.L., supra.*

In arriving at its decision to deny transfer, the trial court considered three separate provisions in the guidelines for good cause to the contrary,[9] to-wit: (i) the advanced stage of the proceedings when the transfer petition was filed; (iii) forum non conveniens; and (iv) the children, being over five years of age, have had little or no contact with the tribe. We will discuss these in reverse order.

Guideline (b)(iv) provides that good cause may exist if "[t]he parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe." *Matter of N.L.*, 754 P.2d 863, 869 (Okla.1988) (child had no contact with tribe and all witnesses resided outside county of tribal court); *Matter of Adoption of Baby Boy L*, 231 Kan. 199, 643 P.2d 168 (1982) (child in Kansas, no contact with tribe in

Oklahoma); *In Interest of J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984) (child had no contact with tribe in South Dakota). The parents, of course, were not available inasmuch as they had voluntarily terminated their parental rights. The trial court made further pertinent findings of fact, summarized as follows: J.J. and S.J. were ages 6 and 7 respectively; they had lived all their lives in Rapid City until placed with the adoptive Indian family in New York; they have never lived on or visited the Standing Rock Reservation nor participated in any tribal activities until placed with the adoptive Indian family; they do not speak Lakota, nor did V.J.; they will not derive any greater benefit from enrollment in the Standing Rock Sioux Tribe than enrollment in any other tribe; and the adoptive Indian family will introduce the children to the Lakota culture and will permit the children to keep their Lakota Heritage;[10] they have bonded with their adoptive parents, and their adoptive parents have bonded with children. The trial court concluded that the children had had little or no contact with the Tribe and their great need for a stable and secure environment greatly outweighs the minimal contacts they may have had with the Tribe or member of said tribe. Importantly, the trial court noted that its jurisdiction was concurrent with the tribal court, that it had transferred many cases to Tribal court before, that it considered it a good judicial system, and that the adequacy of Tribal court or BIA Social Services did not enter into its decision. Guidelines, 44 Fed.Reg. 67,591 ¶ C.3.(c) (state court may not base good cause determination on

---

9. Guidelines, 44 Fed.Reg. 67,591 ¶ C.3 provides the following criteria for good cause to the contrary:

(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the Act to which the case can be transferred.

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

10. Interestingly enough, V.J. admitted she would be satisfied if children were exposed to any Indian culture, and not just Standing Rock Sioux.

perceived inadequacy of tribal services and judicial system). Therefore, we do not find the trial court's finding on this element of good cause to the contrary to be clearly erroneous. *N.L., supra; Baby Boy L, supra; J.R.H., supra.*

Guideline (b)(iii) provides that good cause may exist if "[t]he evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses." As the Guideline points out:

Consideration of whether or not the case can be properly tried in tribal court without hardship to the parties or witnesses was included on the strength of the section-by-section analysis in the House Report on the Act, which stated with respect to the § 1911(b), '[t]he subsection is intended to permit a State court to apply to apply (sic) a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected.' *Id.* at 67,591. (Emphasis in original.)

*See Matter of Appeal in Pima County Etc.*, 130 Ariz. 202, 635 P.2d 187 *cert. denied* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (states may apply modified forum non conveniens); Barsh, 31 Hastings L.J. at 1330 states that "[t]he Interior Department apparently considered transfer to be a privilege rather than a right, similar to the common law doctrine of forum non conveniens." Note, Indian Child Welfare: A Jurisdictional Approach, 21 Ariz.L.Rev. 1123, 1143 (1979). Here again, the trial court made appropriate findings, summarized as follows: all the witnesses are in Rapid City, except the adoptive parents who reside in the state of New York; the Tribal court is quite a long distance from Rapid City; virtually every witness would be required to leave the state of South Dakota and go to Fort Yates, North Dakota, to participate in any further proceedings, including ancillary proceedings; the trial court concluded that the evidence in this case could not be adequately presented to the Tribal court without undue hardship to the parties and the witnesses. *N.L., supra; Baby Boy L, supra; J.R.H., supra; In re Robert T,* 200 Cal.App.3d 657, 666–7, 246 Cal.Rptr. 168, 174 (1988) (almost all witnesses in California, sought transfer to New Mexico); *Bird Head, supra.* We do not find this finding clearly erroneous.

Guideline (b)(i) provides that good cause may exist if "[t]he proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." In this regard, the trial court concluded that, because Tribe did file their petition promptly after receiving notice, good cause to deny transfer does not exist under this subsection. For all of the reasons hereafter expressed, we do not agree with the trial court's conclusion of law in that regard.

While the Act permits intervention at any point in the proceeding, it does not explicitly authorize transfer requests at any time. Although the Act does not explicitly require transfer petitions to be timely, it does authorize the court to refuse to transfer a case for good cause. *Robert T, supra* (16–month delay); *In re Wayne R.N.,* 107 N.M. 341, 757 P.2d 1333, 1336 (1988) (6–month delay); Guidelines, 44 Fed. Reg. 67,590 ¶ C.1.

We first examine the decision on the timeliness basis. As has been earlier pointed out, these children have been in the system for over five years, the first proceeding having been commenced in August of 1984. We assess no blame for this fact. Beyond a doubt, DSS was attempting to comply with the Act by placing the children with V.J. as a member of their extended family after their parents had voluntarily terminated their parental rights. The failure of that plan cannot be attributed to DSS. When V.J. lost her fight to keep the children after the rape incident, she turned to Tribe for help. She caused her daughter, the children's mother, to become an enrolled member of Tribe on December 8, 1988, over four years after the proceedings were started and over two and one-half years after Mother had voluntarily terminated her parental rights.

We grant that Tribe cannot be faulted for the untimeliness of their application for transfer. However, in this particular set of circumstances, we have to peer beyond the ethnocentric stance of Tribe and recognize that it is an unwitting pawn in V.J.'s game. We have to attribute to Tribe the knowledge of V.J. To do otherwise would be to do exactly what the guidelines decry: permit V.J. to come in and manipulate the system after she has lost her own fight. Guidelines, 44 Fed.Reg. at 67,590. We further determine that this manipulation of the system would be detrimental to the well being of the children. *Matter of M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1317 (1981) (best interest of child is a factor that may be considered in good cause determination); *N.L., supra; Chester Cty Dept. of Social S. v. Coleman*, 296 S.C. 355, 372 S.E.2d 912 (1988) (recognizing best interests of child as proper factor to consider); *Robert T, supra; see also* § 1902 (one of the goals of the Act is "to protect best interest of Indian Children.")

Furthermore, the guidelines appear to suggest a balancing test when it is stated:

Permitting late transfer requests by persons or tribes who were notified late may cause some disruption. It will also, however, provide an incentive to the petitioners to make a diligent effort to give notice promptly in order to avoid such disruptions.

*Id.*, at 67,590. In this instance, it appears to us that honoring the late request for transfer will wreak havoc, rather than merely disrupt; all of which far outweighs any sanction against DSS for not having made a more diligent effort to give notice, especially in light of Oglala's claim to be the children's tribe.

As the trial court articulated in its findings of fact: these children have never had a stable and secure environment until placed in adoptive placement in New York in July of 1987; the children have expressed great fear and concern, both physically and emotionally, at the prospect of their returning to South Dakota and being taken away from the home they are in at the present time; when this possibility is discussed, they become fearful, insecure, and regress; these children have been in foster homes many times and in and out of V.J.'s home and their parents' home many times; the Tribe has located a single-parent foster home on the Standing Rock Sioux Tribe Reservation in North Dakota; these children have a desperate need and an absolute right to stability and security in their lives; these children have specific problems related to sexual and physical abuse which have slowly been somewhat resolved with their present adoptive placement, terminating that progress would be detrimental to their well being; the time that the children have been in one place, which they believe will be their permanent home and the harm that will come to them if this is changed, is the court's greatest concern; the harm will be irreparable. The prediction of resultant serious emotional or physical damage to the children was testified to by qualified expert witnesses, as noted in the trial court's findings. Based on these findings, the trial court concluded that good cause to the contrary does exist to deny the transfer. We agree and hold the finding was not clearly erroneous. *M.E.M., supra; Wayne, R.N., supra;* Guidelines, 44 Fed.Reg. 67,590 ¶ C.1. Commentary.

In regard to the issue of timeliness of the petition for transfer, we hold that the trial court erred when it held that subsection (1) is inapplicable because the petition was timely filed. We affirm the denial of transfer on all three grounds.

▮▮ Finally, with respect to children's issue on intervention, we note that the guidelines suggest that intervention is far different than transfer. Therein we find the following:

Late intervention does not have nearly the disruptive effect on the proceeding that last minute transfers do. A case that is almost completed does not need to be retried when intervention is permitted. The problems resulting from 'late intervention are primarily those of the intervenor, who has lost the opportunity to influence the portion of the proceed-

ings that was completed prior to intervention.

Guidelines, 44 Fed.Reg. 67,590, C.1. Commentary. *See also* Trentatdue & DeMontigny, 62 N.D.L.Rev. at 520. We therefore determine that the trial court did not err in granting the application of Tribe to intervene during the appellate proceedings.

For all the foregoing reasons, we affirm the disposition by the trial court as to all the appeals.

All the Justices concur.