The YAVAPAI–APACHE
TRIBE, Relator,

v.

The Honorable Berta MEJIA, Judge,
315th Judicial District, Harris
County, Texas, Respondent.

No. 14–94–01052–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 24, 1995.

Rodolfo Mares, Jr., Houston, for appellant.

Brenda K. Schwartz, Bruce Hughes, William S. Cox, Miriam J. Riskind, Scott R. McLaughlin, Roger Bridgwater, Houston, for appellees.

Before LEE, AMIDEI and EDELMAN, JJ.

## OPINION

LEE, Justice.

On October 25, 1994, the Yavapai–Apache Tribe ("the Tribe"), relator, filed a motion for leave to file petition for writ of mandamus in this Court. *See* Tex.Gov't Code Ann. § 22.221 (Vernon 1988). We granted relator's motion for leave to file on November 8, 1994. On October 6, 1994, the Honorable Berta Mejia, respondent, entered an order in trial court cause number 82282 (consolidated with cause number 93–013623), styled *In the Interest of M.Z.W., M.C.J., and M.T.W., Minors.* In that order, Judge Mejia denied relator's motion to transfer jurisdiction to the Yavapai–Apache Tribal Court. Relator asks this court to order Judge Mejia to rescind her order of October 6, 1994, and order her to enter a new order transferring the cause to the Yavapai–Apache Tribal Court. We deny relator's petition for writ of mandamus.

## ISSUE

This mandamus action involves a dispute over the appropriate jurisdiction for a child custody case involving three Native American children. It requires interpretation of section 1911(b) of the Indian Child Welfare Act of 1978 [hereinafter "ICWA" or "the Act"]. *See* 25 U.S.C.A. § 1911(b) (1983). The question to be determined is whether the trial court abused its discretion in refusing the Tribe's request to transfer jurisdiction to the Yavapai–Apache Tribal Court.

## THE PARTIES

Yvette Rita Johnson ("Johnson") is the natural mother of the three children who are the subject of this dispute: M.C.J. ("Michael"), age five; M.T.W. ("Mark"), age four; and M.Z.W. ("Matthew"), age two. She is a full-blooded member of the Yavapai–Apache Tribe. It is undisputed that the children, Michael, Mark, and Matthew, are eligible for enrollment with the Tribe. Johnson currently resides at the Tonto–Apache Tribe Reservation in Payson, Arizona. Monterey Cayton White, IV ("White") is the father of the two

youngest children, Mark and Matthew. The father of the oldest child is unknown. Michelle Jenkins is the aunt of White. Charles Jenkins is the husband of Michelle Jenkins. The Jenkins are residents of Harris County. The Tribe is a federally recognized Indian tribe as defined by the ICWA. *See* 25 U.S.C.A. § 1903(8) (1983). The Yavapai–Apache Reservation is located in Camp Verde, Arizona.

## PROCEDURAL HISTORY

The initial suit in this case was filed March 12, 1993, in the 315th Judicial District Court under cause number 82282. It was brought by the Harris County Children's Protective Services ("CPS") and styled "SUIT FOR THE PROTECTION OF A CHILD IN AN EMERGENCY AND ORIGINAL PETITION IN SUIT TO AFFECT PARENT–CHILD RELATIONSHIP." The subject of this first action filed by CPS was the youngest child, Matthew. CPS sought to have itself appointed as Managing Conservator of Matthew; alleging there was a serious and immediate question concerning Matthew's welfare. On March 24, 1993, CPS filed its "FIRST AMENDED PETITION IN SUIT TO AFFECT PARENT–CHILD RELATIONSHIP." In its first amended petition, CPS suggested that the court appoint either CPS or Michelle Jenkins as Matthew's managing conservator. Ultimately, Matthew was placed in the Jenkins' home by the CPS which had been appointed temporary managing conservator of Matthew.[1]

The second suit affecting the parent-child relationship concerning the other two children, Michael and Mark, was filed on March 18, 1993, in the 308th Judicial District Court under cause number 93–013623. The second suit was brought by Michelle and Charles Jenkins, real parties in interest in this mandamus action. In their petition, the Jenkins asked the court to appoint them sole managing conservators of Michael and Mark.

The Tribe, having received notice pursuant to 25 U.S.C.A. § 1912(a), intervened and on June 11, 1993, filed a motion to transfer

---

1. This fact was noted in the Jenkins' "ORIGINAL PETITION IN SUIT AFFECTING THE PARENT–CHILD RELATIONSHIP." That petition did not concern Matthew; rather, it concerned Michael and Mark.

jurisdiction in the 308th Judicial District Court in cause number 93–013623, the case concerning Michael and Mark. On August 25, 1993, the Tribe filed a similar motion in the 315th Judicial District Court in cause number 82282, the case concerning Matthew. These motions were filed pursuant to the ICWA and based specifically on section 1911(b).

In October of 1993, White executed a statement of paternity and sought a decree adjudicating Mark and Matthew as his biological children. The trial court signed a decree of paternity on March 8, 1994, adjudicating Mark and Matthew as the children of White. In the decree, the court named White the possessory conservator but found good cause to deny any specific periods of possession at the time. The court further ordered White to pay child support for the children to the Jenkins.

On November 3, 1993, Judge Mejia signed an order consolidating the two cases under the older and lower case number, thereby placing both cases in the 315th Judicial District.

Following the consolidation, the Tribe filed its "RENEWED MOTION TO TRANSFER JURISDICTION AND TO DISMISS THE CASE" on January 14, 1994. On August 26, 1994, the motion to transfer, as consolidated, was heard in the 315th Judicial District. On October 6, 1994, the trial court denied the Tribe's motion. In its order, the trial court made the following findings:

> The Court, having examined the pleadings and heard the evidence and argument of counsel, finds by clear and convincing evidence, that:
>
> 1. The children the subject of this suit are Indian children, as described under the *Indian Child Welfare Act;*
> 2. The children were not domiciles of the reservation, nor did they reside within the reservation at the time of placement or at any other time, but reside in Texas;
> 3. The 315th Judicial District Court of Harris County, Texas, has concurrent jurisdiction pursuant to the *Indian Child Welfare Act;*
> 4. Proper notice has been given to all parties and the children's mother's tribe;
> 5. MONTEREY CAYTON WHITE, IV, a parent of two of the children the subject of this suit, objects to the transfer of these proceedings to the Tribal Court;
> 6. Good cause exists to deny the transfer of these proceedings to the Tribal Court;
> 7. It is in the best interest of the children to retain jurisdiction in the 315th Judicial District Court of Harris County, Texas;
> 8. The Court has taken judicial notice of the contents of the Court's file;
> 9. That YVETTE RITA JOHNSON, has an extensive history of substance abuse, neglect of the children, and of abandonment of the children;
> 10. That the children have resided in a stable environment since April of 1993;
> 11. The children are ages 2, 4 and 6 and have had little or no contact with the mother's tribe, and only three months contact with another tribe during their lifetime;
> 12. This suit affecting the parent-child relationship could not be adequately presented to the Tribal Court without undue hardship to the parties and witnesses, because the bulk of witnesses are located in Harris County, Texas;
> 13. It would not be in the best interest of the children to have separate and distinct hearings, with the possibility that the results would be that the children might be separated;
> 14. That YVETTE RITA JOHNSON is in agreement that the children should not be separated.

Based on these findings, the trial court denied the Tribe's motion to transfer jurisdiction.

On October 25, 1994, the Tribe filed a motion for leave to file petition for writ of mandamus in this court. The Tribe asked this court to order Judge Mejia to rescind her order of October 6, 1994, and direct her

to enter an order transferring the case to the Yavapai–Apache Tribal Court. We granted the Tribe's motion for leave to file, and oral argument was held before this court on February 14, 1995.

## STANDARD OF REVIEW

In a mandamus proceeding, the court must determine whether the relator has an adequate remedy by appeal, and whether the trial court abused its discretion in entering the order complained of. *Plaza Court, Ltd. v. West*, 879 S.W.2d 271, 275 (Tex.App.—Houston [14th Dist.] 1994, orig. proceeding). The burden of showing an abuse of discretion as well as the inadequacy of a remedy by appeal is placed on the relator, the party seeking the writ. *Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 305 (Tex.1994). This burden is "a heavy one." *Id.* (quoting *Lutheran Social Serv., Inc. v. Meyers*, 460 S.W.2d 887, 889 (Tex. 1970)).

Mandamus will not issue when there is an adequate remedy by appeal because mandamus is intended to be an extraordinary remedy available only in limited circumstances. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992). A writ of mandamus will issue only in situations involving manifest and urgent necessity. *Id.*

A trial court clearly abuses its discretion if it reaches a decision "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* at 839 (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985)). Put another way, a trial court abuses its discretion if it acts without reference to any guiding rules or principles of law. *Plaza Court*, 879 S.W.2d at 275 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). Mere error in judgment does not constitute an abuse of discretion. *Aktiengesellschaft v. Kirk*, 859 S.W.2d 651, 652 (Tex. App.—Eastland 1993, orig. proceeding) (citing *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985)). A determination of factual matters is committed to the sound *discretion of the trial court*, and in the resolution of factual issues, the appellate court may not substitute its judgment for

that of the trial court. *Walker*, 827 S.W.2d at 839. However, the appellate court's review of a trial court's determination as to what the law is, or its application of the law to the facts is much less deferential. *Id.* at 840. A trial court's failure to analyze the law properly or apply it to the facts correctly constitutes an abuse of discretion. *Id.*

### Application of the Standard of Review.

The first question we must resolve is whether the situation before us is proper for mandamus review. Then, if the case is subject to mandamus review, we must decide whether the trial court abused its discretion.

The Texas Supreme Court has frequently held that an appeal is inadequate to protect the rights of children and parents in family law situations. *See, e.g., Proffer v. Yates*, 734 S.W.2d 671, 673 (Tex.1987). *See also Hutchings v. Biery*, 723 S.W.2d 347, 350 (Tex.App.—San Antonio 1987, orig. proceeding). "Justice demands a speedy resolution of child custody and child support issues." *Id.* Thus, because this case involves the rights of parents and children, it is subject to review by mandamus.

The next question is whether the trial court abused its discretion by refusing to transfer the case to the Yavapai–Apache Tribal Court. Relator contends the trial court abused its discretion in denying its motion to transfer because in its determination of whether "good cause" existed to deny transfer to the Tribal Court, the trial court considered: (1) whether this suit could be adequately presented to the Tribal Court without undue hardship to the parties and witnesses; (2) the "best interests of the children;" and (3) the contacts of the children with the Tribe. The Tribe also argues the trial court abused its discretion in denying the transfer because it misinterpreted the ICWA by finding that White was a "parent" with the power to object to the transfer as to Mark and Matthew. The trial court found "good cause" based on numerous separate grounds. If any one of these grounds is an appropriate consideration, the trial court did not abuse its discretion in denying the Tribe's motion to transfer. Apart from the

"good cause" findings, if the trial court correctly determined that White was a "parent" under the ICWA, she properly denied the motion to transfer as to Mark and Matthew.

## ANALYSIS

1. **Historical Overview of the Indian Child Welfare Act.**

Before 1968, the United States followed an "assimilation" policy with regard to Indians. Note, *Indian Child Welfare: A Jurisdictional Approach*, 21 ARIZ.L.REV. 1123, 1123 (1979) (citing Act of August 15, 1953, Pub.L. No. 83–280, ch. 505, 67 Stat. 588–90 (current version at 18 U.S.C.A. § 1162 (1983); 28 U.S.C.A. § 1360 (1983))). *See also Estate of Johnson*, 125 Cal.App.3d 1044, 1048, 178 Cal. Rptr. 823, 826 (Cal.Ct.App.1981), *cert. denied by Cory v. Campbell*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982) (recognizing that assimilation policy existed in United States in the 1900s). In other words, the United States sought to encourage Indians to become part of mainstream American culture. In the late 1950s and early 1960s, however, federal policy began to shift. *See, e.g.*, Felix S. Cohen, *Handbook of Federal Indian Law* 180 (1982). The Indian Civil Rights Act of 1968 reversed the assimilation policy, recognizing the importance of the preservation of Indian society and culture. *See* 25 U.S.C.A. §§ 1301–1341 (1983).

The preservation of Indian society and culture clearly involves Indian children, for children necessarily sustain the culture of a people from one generation to the next. In the 1970s, Congress conducted an investigation and held hearings on the "alarmingly" high rate of removal of Indian children from their native homes in child welfare cases. *See* 25 U.S.C.A. § 1901(4). More often than not, when a state welfare agency received reports or investigated allegations of abuse or neglect and those reports involved Indians, the child would be removed. Hearings conducted before the Senate Committee on Indian Affairs in 1974 revealed a pattern of discrimination against American Indians in child welfare and child custody matters. *In re Appeal in Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187, 188 (Ariz.Ct. App.1981), *cert. denied by Catholic Social Services of Tucson v. P.C.*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Testimony before the Senate revealed that for years, large numbers of Indian children had been removed from their homes and reservations and placed in non-Indian homes.[2] *Id.* The testimony also showed that many of the removals were unwarranted and were based on the fact that the officials involved failed to show any deference to Indian "cultural norms." *Id.* The removals deprived the tribes of their most important resource, their children, and deprived the children of their heritage. *Id.* In response to this evidence, Congress passed the Indian Child Welfare Act of 1978 in an effort to reverse the erosion of Indian family life. *See id.* Congress stated the policy behind the Act in section 1902:

> The Congress hereby declares that it is the policy of this Nation to protect the best interest of Indian children and to promote the stability and security of Indian tribes and families by the establishment of mini-

2. Statistical evidence presented by William Byler, executive director of the Association on American Indian Affairs, and other witnesses showed that approximately 85% of the Indian children removed from their homes were placed in non-Native American homes. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act*, 79 IOWA L.REV. 585, 601 (1994) (citing *Indian Child Welfare Program: Hearings Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs*, 93rd Cong., 2d Sess. 1, 99–100 (1974)). Even more frightening, a 1976 survey in New Mexico revealed that Indian children were placed for adoption by public agencies at a per capita rate 1.5 times higher than the rate for non-Indian children and in foster care at 2.4 times the rate for non-Indian children. Garry Wamser, *Child Welfare Under the Indian Child Welfare Act of 1978: A New Mexico Focus*, 10 N.M.L.REV. 413, 414 (1980) (citing Association on American Indian Affairs, Indian Child Welfare Statistics Survey (1976), *reprinted in* Hearing on S. 1214 Before the Select Comm. on Indian Affairs, 95th Cong., 1st Sess. 537–603 (1977)). When the New Mexico surveyors added these figures to the number of Indian children attending boarding schools operated by the Bureau of Indian Affairs, they concluded that Indian children are separated from their families 74.6 times more often than non-Indian children in New Mexico. Association on American Indian Affairs, Indian Child Welfare Statistics Survey (1976), *reprinted in* Hearing on S. 1214 Before the Select Comm. on Indian Affairs, 95th Cong., 1st Sess. 577 (1977).

mum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C.A. § 1902 (1983). Thus, by passing the ICWA, Congress sought to ensure the continued viability of Indian tribes by protecting Indian children from cultural genocide. Paul Shunatona and Tricia Tingle, *Indian Child Welfare Act in Texas—An Overview*, 58 TEX.B.J. 352, 352 (1995).

 On November 8, 1978, President Carter signed the ICWA into law.[3] Manuel P. Guerrero, *Indian Child Welfare Act of 1978: A Response to the Threat to Indian Culture Caused by Foster and Adoptive Placements of Indian Children*, 7 AM.INDIAN L.REV. 51, 66 (1979) (citing Indian Child Welfare Act of 1978, Pub.L. 95–608, 92 Stat. 3069, 25 U.S.C. § 1901 et seq.). The Act applies to all state child custody proceedings involving an Indian child. Douglas R. Nazarian, *Catholic Social Services, Inc. v. C.A.A.: Best Interests and Statutory Construction of the Indian Child Welfare Act*, 7 ALASKA L.REV. 203, 205 (1990). *See* 25 U.S.C.A. § 1903(1) (1983) (definition of child custody proceeding);[4] 25 U.S.C.A. § 1903(4) (1983) (definition of Indian child).[5] We note that there is no question that the case before us falls under the ICWA. It is undisputed that this matter involves a "child custody proceeding" and that the children are "Indian children" as those terms are defined by the Act.

### 2. Jurisdiction and the Indian Child Welfare Act.

At the core of the Act are the provisions concerning jurisdiction over Indian child cus-

tody proceedings. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36, 109 S.Ct. 1597, 1601–02, 104 L.Ed.2d 29 (1989); *In re J.L.P.*, 870 P.2d 1252, 1256 (Colo.Ct.App.1994). *See also* 25 U.S.C.A. § 1911 (1983). The Act provides for a dual jurisdictional scheme. *Id.* First, the Act attempts to protect the welfare of Indian families by giving exclusive jurisdiction to the tribal courts in any child custody proceeding involving an Indian child who resides or is domiciled on the tribe's reservation. *Holyfield*, 490 U.S. at 36, 109 S.Ct. at 1601–02; *In re Adoption of a Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925, 931 (N.J.1988). This protection is codified in section 1911(a) and states the following:

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

25 U.S.C.A. § 1911(a) (1983).

 The ICWA does not, however, completely divest state courts of their jurisdiction over children of Indian descent. *In re C.W.*, 239 Neb. 817, 479 N.W.2d 105, 112 (Neb.1992) (citing *Kiowa Tribe of Oklahoma v. Lewis*, 777 F.2d 587 (10th Cir.1985), *cert. denied*, 479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986)). Section 1911(b) creates concurrent jurisdiction in the case of children not domiciled on the reservation; however, there is a presumption in favor of tribal court

---

**3.** The ICWA was not, however, generally effective until 180 days after its enactment. *See* 25 U.S.C.A. § 1923 (1983).

**4.** A "child custody proceeding" includes foster care matters, termination of parental rights, preadoptive placements, and adoptive placements. It does not include a placement based on an act which, if committed by an adult, would be deemed a crime, or on an award in a divorce proceeding of custody to one of the parents. In other words, it does not include divorce or juvenile delinquency proceedings. 25 U.S.C.A.

§ 1903(1) (1983). *See also* Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test*, 27 GONZ.L.REV. 353, 359 (1991–92).

**5.** An "Indian child" is any unmarried person under the age of eighteen who is either: (1) a member of an Indian tribe; or (2) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C.A. § 1903(4) (1983).

jurisdiction. *Holyfield,* 490 U.S. at 36, 109 S.Ct. at 1601–02. Section 1911(b) states:

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

25 U.S.C.A. § 1911(b) (1983) (emphasis in the original).

■■■■ Thus, state courts may exercise jurisdiction concurrently with the tribal courts with respect to Indian children who are not domiciled on their Tribe's reservation; however, the state court must defer to the tribal court unless: (1) either parent objects; (2) the Tribe declines the transfer; or (3) "good cause" is shown for the retention of state jurisdiction.[6] *In re Appeal in Pima County,* 635 P.2d at 188–89; Russell Lawrence Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis,* 31 HASTING L.J. 1287, 1316–1317 (1980). Section 1911(b) modifies the general rule that Indians off the reservation are subject to state jurisdiction by requiring that state courts transfer jurisdiction of child custody proceedings to the tribe upon petition by the Indian child's parent, Indian custodian, or tribe unless a parent objects, the tribe declines, or there is good cause not to transfer. *Id.;* 25 U.S.C.A. § 1911(b) (1983). *See generally* 25 U.S.C.A. § 1903(5) ("Indian child's tribe"); 25 U.S.C.A. § 1903(6) ("Indian custodian"); 25 U.S.C.A. § 1903(9) ("parent"). Under the ICWA, if the tribe, parent, or Indian custodian of the child petitions for transfer of the proceeding to the tribal court, the state court cannot proceed without first determining whether jurisdiction of the matter should be transferred to the Tribe. *In re C.W.,* 479 N.W.2d at 112. If there is no objection by a parent and no refusal by the tribe to accept jurisdiction, the determination of whether the proceeding should be transferred turns on the issue of whether "good cause" exists to deny the transfer. *See* 25 U.S.C.A. § 1911(b) (1983).

■■■■ Determining whether good cause exists to retain jurisdiction is within the trial court's discretion. *In re J.L.P.,* 870 P.2d at 1256 (citing *In re Dependency & Neglect of A.L.,* 442 N.W.2d 233 (S.D.1989); *In re Wayne R.N.,* 107 N.M. 341, 757 P.2d 1333, 1335 (N.M.1988)). A good cause determination is necessarily made on a case-by-case basis after consideration of all the circumstances involved. *In re J.L.P.,* 870 P.2d at 1256 (citing *In re Wayne R.N.,* 757 P.2d at 1335). Thus, the determination is by its nature subjective, requiring a balancing process of the rights of the state, the child, and the tribe. Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test,* 27 GONZ.L.REV. 353, 386 (1991–92). The burden of establishing good cause not to transfer jurisdiction is on the party opposing the transfer. *In re J.L.P.,* 870 P.2d at 1257 (citing *In re Armell,* 194 Ill.App.3d 31, 141 Ill.Dec. 14, 550 N.E.2d 1060 (Ill.Ct. App.1990), *appeal denied,* 132 Ill.2d 545, 144 Ill.Dec. 255, 555 N.E.2d 374, *cert. denied,* 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990); Department of Interior, Bureau of Indian Affairs, *Guidelines for State Courts; Indian Child Custody Proceedings,* 44 Fed. Reg. 67,584, 67,591 (1979) [hereinafter BIA Guidelines or Guidelines].

The ICWA does not define "good cause." *In re J.L.P.,* 870 P.2d at 1256. The legislative history of the Act states that the use of

---

6. One commentator, highly critical of section 1911(b), suggests that the "good cause" language should be removed from the section altogether. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act,* 79 IOWA L.REV. 585, 648 (1994). She asserts that while paying homage to Native American culture by recognizing that tribal jurisdiction extends to Indians who do not live within a tribe's geographic boundaries, the section subjects the value of tribal involvement to Anglo standards through the proviso that a state court can refuse to transfer a case for good cause when that term is undefined anywhere in the Act. *Id.* at 598–99. Carriere argues that a state court should only retain jurisdiction if the tribal court declines the transfer or if one of the parents of the child objects. *Id.* at 648–49.

the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. *Chester County Dept. of Social Servs. v. Coleman,* 296 S.C. 355, 372 S.E.2d 912, 914 (S.C.Ct.App.1988) (citing H.R.REP. No. 1386, 95th Cong., 2nd Sess. 21, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7544). Thus, it appears that the Act purposely failed to define "good cause" in order to give state courts discretion in determining whether to transfer cases. However, the Bureau of Indian Affairs (BIA) has issued guidelines interpreting the ICWA's definition of "good cause to the contrary." *In re C.W.,* 479 N.W.2d at 113. The BIA Guidelines state that good cause not to transfer the proceeding exists if the child's tribe does not have a tribal court and good cause may also exist if any of the following circumstances are present:

(i) the proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing;

(ii) the Indian child is over twelve years of age and objects to the transfer;

(iii) the evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses; or

(iv) the parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

*BIA Guidelines,* 44 Fed.Reg. at 67,591. Further, the Guidelines prohibit consideration of such factors as: (1) the socio-economic conditions of the tribe; and (2) the perceived inadequacy of tribal or Bureau of Indian Affairs social services or judicial systems. *Id.*

Although the BIA followed the rulemaking procedures of the federal Administrative Procedure Act in creating these Guidelines, the BIA Guidelines were not published as regulations because they were not intended to have binding legislative effect. *See* 5 U.S.C.A. § 551, et seq. (1977) (defining rulemaking procedures); *BIA Guidelines,* 44 Fed.Reg. at 67,584. In fact, the introduction to the Guidelines specifically states that primary responsibility for interpreting language in the Act, other than that specifically reserved for interpretation by the Secretary of the Interior, "rests with the courts that decide Indian child custody cases."[7] *Id.* The introduction further states that while courts will take into account what the Department of the Interior has to say about the ICWA, they are free to act contrary to the interpretations of the Department of the Interior if they are convinced that the Guidelines in question is not required by the ICWA itself. *Id.* Thus, while the Guidelines clearly are not binding in that they are interpretative rather than legislative in nature, the interpretation in the Guidelines should be given important significance. *See D.E.D. v. State,* 704 P.2d 774, 779 n. 8 (Alaska 1985) (holding that while not binding on state courts, BIA Guidelines are instructive); *In re Appeal in Maricopa County Juvenile Action No. A–25525,* 136 Ariz. 528, 532 n. 4, 667 P.2d 228 (Ariz.Ct.App.1983) (holding that BIA Guidelines are useful source of information for questions arising over implementation of ICWA); *In re Junious M.,* 144 Cal.App.3d 786, 792 n. 7, 193 Cal.Rptr. 40 (Cal.Ct.App. 1983) (holding that BIA Guidelines are entitled to great weight); *In re Dependency and Neglect of A.L.,* 442 N.W.2d 233, 236 (S.D.

---

**7.** When Congress expressly delegates to the Secretary of the Department that oversees the statute at issue the primary responsibility for interpreting statutory language, the regulations interpreting the language or term are legislative or substantive regulations and have the force and effect of law. *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) (citing U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). For example, under section 1918 of the ICWA, the Secretary is directed to determine whether a plan for reassumption of jurisdiction is "feasible" as that term is used in the statute. 25 U.S.C.A. § 1918 (1983); Department of Interior, Bureau of Indian Affairs, *Guidelines for State Courts; Indian Child Custody Proceedings,* 44 Fed.Reg. 67,584, 67,584 (1979). The regulations covering section 1918 would therefore be binding. These and other areas in the statute where primary responsibility for implementing portions of the ICWA are published at 44 Fed.Reg. 45,092 (1979). The Secretary of the Interior was not given the primary responsibility for interpreting the phrase "good cause." *See* 25 U.S.C.A. § 1911.

1989) (holding that BIA Guidelines are not binding, but should be given important significance). *See generally Batterton v. Francis*, 432 U.S. 416, 424–25, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) (holding that administrative interpretations of statutory terms are given important but not controlling significance).

### 3. "Good cause" and the Modified Forum Non Conveniens Doctrine.

The only specific Guideline at issue in the case before us is number (iii), which states that good cause may exist if:

> (iii) the evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

The provision was included on the strength of a section-by-section analysis in the House Report on the ICWA which stated, with respect to section 1911(b):

> The subsection is intended to permit a State court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected.

*BIA Guidelines*, 44 Fed.Reg. at 67,591 (quoting H.R.REP. No. 1386, 95th Cong., 2d Sess., reprinted in 1978 U.S.C.C.A.N. 7530, 7544) (emphasis in original).

■ This provision has been interpreted by the courts, in accordance with the commentary in the Guidelines, to allow state courts to apply a modified forum non conveniens doctrine, and the courts have frequently done so. The doctrine is modified under the ICWA in that generally, courts applying forum non conveniens use it to refuse jurisdiction and transfer the case to an alternate forum. *See Koster v. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947). However, in the Indian child welfare context, the state court determines if the tribal court is an inconvenient forum; if the state court finds the tribal court is an inconvenient forum, good cause exists to retain jurisdiction. *Chester County Dept. of Social Services v. Coleman*, 303 S.C. 226, 399 S.E.2d 773, 775 (1991). In other words, under the modified doctrine, the trial court does not decide whether it is an inconvenient forum; rather, it decides whether the tribal court is inconvenient. Further, the doctrine is modified so that the state court must also consider and protect the rights of the Indian child and the tribe in its forum non conveniens review. Note, *Indian Child Welfare: A Jurisdictional Approach*, 21 ARIZ.L.REV. 1123, 1142 (1979).

■ Dozens of ICWA cases exist in which courts have considered the modified doctrine of forum non conveniens in determining whether to transfer a child custody case under section 1911(b). *E.g., In re C.E.H.*, 837 S.W.2d 947, 954 (Mo.Ct.App. 1992); *In re Wayne R.N.*, 107 N.M. 341, 757 P.2d 1333 (N.M.Ct.App.1988); *Chester County Dept. of Social Servs. v. Coleman*, 303 S.C. 226, 399 S.E.2d 773, 775–76 (1990); *In re J.J.*, 454 N.W.2d 317 (S.D.1990). Most often, courts have used the doctrine to deny the transfer, and upon review, the finding has been sustained. *E.g., In re T.S.*, 245 Mont. 242, 801 P.2d 77, 82 (Mont.1990), *cert. denied by King Island Native Community v. Montana Dep't of Family Serv.*, 500 U.S. 917, 111 S.Ct. 2013, 114 L.Ed.2d 100 (1991). *But see In re J.L.P.*, 870 P.2d at 1258 (holding that party opposing transfer failed to establish undue hardship if proceedings were transferred to tribal court so as to establish good cause). However, the mere fact that the doctrine has been used most often to deny transfers does not make it an inappropriate consideration. All of the case law and the BIA Guidelines state that it is proper for the trial court to consider the hardship to the parties and the witnesses in making the transfer determination. Thus, the trial court in this case did not act contrary to guiding principles of law when it considered the modified forum non conveniens doctrine in determining whether to grant relator's motion to transfer.

■ However, relator argues that this case is different and the trial court did abuse its discretion in considering the doctrine because the Tribe offered to sit in Houston, and thus, there would be no undue hardship to the parties or the witnesses and no reason to

deny the transfer based on forum non conveniens.

The commentary in the Guidelines recognizes that application of the modified forum non conveniens doctrine may limit transfers to cases involving Indian children who do not live far from the reservation. *BIA Guidelines*, 44 Fed.Reg. at 67,591. However, even though the Department of the Interior was aware of this tendency, the Department still included "undue hardship to the parties and witnesses" as good cause to deny a transfer. *Id.* Although the commentary suggests that this problem "may be alleviated in some instances by having the court come to the witnesses," the commentary states that the Department of the Interior is aware of only one case under the ICWA where transfer to the tribal court was conditioned on having the tribal court meet in the city where the family lived. *Id.*

■ While we do not doubt the sincerity of relator's offer to have the tribal court assemble in Houston, we find that a significant question exists as to whether the tribal court can convene outside its territorial limits and issue orders or judgments that have binding effect.[8] If the tribal court may convene in Houston and issue binding judgments and orders, perhaps the trial court erred in considering the modified doctrine of forum non conveniens in determining whether good cause existed. However, if the tribal court cannot sit outside its territorial limits and issue binding orders or judgments, then the trial court did not abuse its discretion in

discounting relator's offer and relying on forum non conveniens.

■ In *People v. Craig*, 151 Misc.2d 442, 581 N.Y.S.2d 987, 988 (N.Y.Sup.Ct.1992), the prosecution sought to "conditionally examine" a witness who was hospitalized outside the state.[9] The court denied the prosecution's request stating:

> Since a conditional examination must be a regular court proceeding conducted by a judge, it is fairly obvious that it may not be taken "on the road" and conducted in **another state.**

*Id.* at 989 (emphasis in the original). The court stated the law and reasoned as follows:

> It is a universally accepted principle of law that a court may not sit outside the territorial limits of its **jurisdiction,** for any reason whatsoever, even with (and, a fortiori, without,) the consent of all parties, and any proceeding so conducted is a nullity. [citations omitted]
>
> \* \* \* \* \* \*
>
> A judge of this state who crosses a state line instantly undergoes a transformation as dramatic as Cinderella's midnight metamorphosis; the judge turns into an ordinary citizen travelling in another state, with no more power to hold court or administer oaths and affirmations than any other private person might have.

*Id.*

■ Cases based on the same concepts are found in this state. For example, in *Isbill v. Stovall*, 92 S.W.2d 1067, 1069 (Tex.

---

**8.** Neither party cited any relevant authority on this issue. Relator simply stated that the tribal court had offered to sit in Houston. It did not offer any state, federal, or Indian authority for the proposition that a tribal court could sit outside its territorial limits and that any decisions made would have binding effect. Relator did cite 25 U.S.C.A. § 1911(d); however, that section simply states that tribal court decisions under the Indian Child Welfare Act are to be given full faith and credit. This has been interpreted to mean that they are to be given the same effect as decisions by any other judicial entity. *In re T.R.M.*, 525 N.E.2d 298, 306 (Ind.1988), *cert. denied, by J.Q. v. D.R.L.*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). The statute does not require a state court to give absolute deference to a tribal court order regardless of the

circumstances. *Id.* This still does not resolve the issue of whether any court can sit outside its territorial jurisdiction and make binding decisions.

**9.** In New York, a conditional examination is used in criminal cases to preserve the testimony of a potentially unavailable witness. *People v. Craig*, 151 Misc.2d 442, 581 N.Y.S.2d 987, 988 (N.Y.Sup.Ct.1992). This type of examination must "simulate and mirror the examination of such witness at a trial itself." *Id.* at 989 (quoting Bellacosa, Practice Commentary, McKinney's Consolidated Laws of New York, Book 11A, CPL 660.60, p. 330 (1984)). The only difference is the absence of a jury and the presence of a video camera. *Id.* at 989. The proceeding is a regular court proceeding conducted by a judge. *Id.*

Civ.App.—Eastland 1936, no writ), a Jones County district court tried a case and rendered a judgment in Taylor County. On appeal, the appellant argued that the trial court was without jurisdiction to enter the judgment in question because the court was acting outside its territorial limits. *Id.* The court of appeals held that the trial court had no jurisdiction to try a civil suit and render judgment while sitting in a county other than Jones County because the court was not authorized to do so. *Id.* at 1070–71. In other words, a court may not convene outside its territorial limits and issue orders or judgments that are binding unless authorized by law. *See id.* As the appellate court stated:

> A court is an agency of the sovereign created by it directly or indirectly under its authority consisting of one or more officers, established and maintained for the purpose of hearing and determining issues of law and fact regarding legal rights and alleged violation of the law, authorized to exercise its powers in due course of law at times and *places* previously determined by lawful authority.

*Id.* at 1077 (quoting Townes Texas Pleading, p. 7) (emphasis in court of appeals opinion).

■ Thus, under Texas law, a trial or hearing held at a time or in a place not authorized by law is a nullity, and any judgment issuing therefrom is void. *See Howell v. Mauzy,* 899 S.W.2d 690, 699 (Tex.App.—Austin 1994, n.w.h.) (holding that district court judge has no power to adjudicate rights of litigants except at time and places prescribed by law for holding court); *Ex parte Lowery,* 518 S.W.2d 897, 901–02 (Tex.Civ. App.—Beaumont 1975, orig. proceeding) (citing *State v. Sammons,* 223 Ind. 27, 57 N.E.2d 587, 590 (Ind.1944); *Wood v. Cox,* 251 S.W.2d 798, 799 (Tex.Civ.App.—Dallas 1952), *rev'd on other grounds,* 152 Tex. 283, 256 S.W.2d 841 (1953) (holding that statute authorized juvenile court to sit outside the boundaries of Dallas).

Texas and New York are not alone in embracing the idea that, unless authorized by law, a tribunal may not issue binding decisions if it convenes and issues those decisions outside its territorial limits. We have found numerous cases dealing with this issue, and the majority of them hold that a court may not issue binding decisions when it is outside its territorial limits. *See Howell v. Van Houten,* 227 Ark. 84, 296 S.W.2d 428 (Ark. 1956); *Francis v. Wells,* 4 Colo. 274 (Colo. 1878); *Goodman v. Little,* 96 Ga.App. 110, 99 S.E.2d 517 (Ga.Ct.App.1957); *Tanner v. Beverly Country Club,* 217 La. 1043, 47 So.2d 905 (La.1950); *Miller v. Ashurst,* 86 Nev. 241, 468 P.2d 357 (Nev.1970); *Madison Nat'l Life Ins. Co. v. Second Judicial Dist.,* 85 Nev. 6, 449 P.2d 256 (Nev.1969); *House of Style Furniture Corp. v. Scronce,* 33 N.C.App. 365, 235 S.E.2d 258 (N.C.Ct.App. 1977). *See generally* Annotation, *Place of Holding Sessions of Trial Court as Affecting Validity of its Proceedings,* 18 A.L.R.3d 572, 589–98 (1968 & Supp.1994).

Further, the United States Supreme Court supports a holding that a court cannot produce binding decisions outside of its territorial limits unless authorized by law:

> The authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established. Any attempt to exercise authority beyond those limits would be deemed in every other forum, as has been said by this court, an illegitimate assumption of power, and be resisted as mere abuse.

*Pennoyer v. Neff,* 95 U.S. 714, 720, 24 L.Ed. 565 (1877). Finally, the United States Supreme Court has applied this longstanding principle specifically to Indians, by stating that:

> Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.

*Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973).

We have been cited no authority and have found none, either in the federal or Texas state law, that authorizes a tribal court to sit outside its territorial limits.[10] Thus, relator's

10. Relator made a blanket statement in a brief to the trial court that the tribal court has full powers to issue subpoenas, conduct investigations, and enforce its orders. Relator provided no au

offer to have the tribal court convene in Houston has no bearing on the trial court's consideration of the modified forum non conveniens doctrine, and the trial court was correct to disregard it.

The trial court found that good cause existed to deny the transfer based on the modified forum non conveniens doctrine. Based on case law and the interpretation of good cause in the BIA Guidelines, we hold that the doctrine was an appropriate consideration in determining whether good cause exists to refuse to transfer a child custody proceeding to a tribal court. The evidence and the witnesses necessary for any custody determination in this case are obviously in Texas. Also, the Tribe's offer to convene in Houston is not a viable option, and, therefore, the trial court did not err in discounting it. We hold that the trial court did not abuse its discretion in considering "undue hardship to the parties or witnesses" as a basis for good cause. This finding alone was a sufficient ground on which to deny relator's motion to transfer as to all three of the children; however, because this is a case of first impression in this state, we will consider relator's remaining contentions.

### 6. "Good Cause" and "Best Interests."

Relator next contends that the trial court abused its discretion in finding that good cause existed to deny the transfer based on the best interests of the children. The real parties in interest disagree and argue that because the term "good cause" creates flexibility in determining the disposition of a placement proceeding, Congress implicitly recognized that the best interest of the child standard is appropriate under section 1911(b).

■ The best interest of the child test in the Anglo–American legal systems considers a number of factors: (1) the desires of the child; (2) the emotional and physical need of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5)

the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See, e.g., Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). While this list is not exhaustive, it does indicate a number of considerations which have been or would appear to be pertinent. *Id.* When state courts use this test, they obviously consider the factors from their own perspective, that is, an Anglo–American point of view.

■ Whether the "Anglo" best interest of the child test should be an element of the good cause test is a difficult question. Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test*, 27 Gonz.L.Rev. 353, 387 (1991–92). The Act itself is silent on the issue, while the Guidelines suggest the best interest of the child has no place in determining good cause. *Id.* The courts are split on this issue. *Compare In re C.E.H.*, 837 S.W.2d at 954 (rejecting best interest standard in transfer cases) *with In re Appeal in Maricopa County Juvenile Action No. JS–8287*, 171 Ariz. 104, 828 P.2d 1245, 1251 (Ariz.Ct.App.1991) (holding that trial court may consider best interest when deciding whether to transfer custody proceeding to tribal court). Although the standard of review in this case is abuse of discretion, a trial court is given much less deference in determining what the law is. *Walker*, 827 S.W.2d at 840. After reviewing all of the available case law on both sides of the issue, we hold that those courts that reject the best interest test, when determining motions to transfer, are correct.

■ The "best interest of the child" is the backbone of American family law when custody is an issue. *See, e.g.,* Tex.Fam.Code Ann. § 14.07(a) (Vernon Supp.1995) (stating

---

thority for that statement and did not state the geographical area in which those powers are

valid.

that best interest of child shall always be primary consideration of court in question of managing conservatorship, possession, support, and access). *See generally Holley*, 544 S.W.2d at 372 (setting forth Texas best interest test). However, we find that consideration of the best interest of the child in determining whether good cause exists under section 1911(b) is improper because: (1) it defeats the very purpose for which the ICWA was enacted, in that, it allows Anglo cultural biases into the analysis; and (2) questions of "best interest" are appropriate to issues of placement, not jurisdiction.[11]

Several state courts have utilized the "best interest of the child" as a definition of good cause, and as a reason not to transfer cases to tribal courts. The Montana Supreme Court was the first to advocate the use of "best interest" as a possible factor under good cause in a case concerning a dependency and neglect action involving a Sioux Indian child. *In re M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1314 (Mont.1981). The supreme court, while reversing and remanding the case back to the trial court because the trial court failed to appoint counsel for the indigent mother as required under section 1912(b), stated that on remand the trial court had to decide whether to transfer the case to the tribal court and in making its determination should consider the BIA Guidelines; most importantly, the court held that "the best interest of the child could prevent transfer of jurisdiction." *Id.* at 1317.

Other state courts have followed the Montana decision and held that the best interest standard is an appropriate consideration in determining whether good cause exists to deny transfer to a tribal court. *In re Appeal in Maricopa County Juvenile Action No. JS–8287*, 171 Ariz. 104, 828 P.2d 1245, 1251 (Ariz.Ct.App.1991); *In re Robert T.*, 200 Cal.App.3d 657, 665, 246 Cal.Rptr. 168 (Cal. Ct.App.1988); *In re T.R.M.*, 525 N.E.2d at 307–08; *In re C.W.*, 479 N.W.2d at 114; *In re N.L.*, 754 P.2d 863, 869 (Okla.1988); *In re J.J.*, 454 N.W.2d 317, 331 (S.D.1990). At

least one of these cases based its holding on section 1902, concluding that this section provides justification for the use of the best interest test because it states that the policy of the Act is "to protect the best interest of Indian children." *See In re T.R.M.*, 525 N.E.2d, at 307–08. *See also* 25 U.S.C.A. § 1902(b) (1983). Although the Indiana court correctly stated the language contained in section 1902, and we agree that the ICWA is clearly concerned with the best interests of Indian children, the phrase "best interests of Indian children" in the context of the ICWA is different than the general Anglo–American "best interest of the child" standard used in cases involving non-Indian children. *Quinn v. Walters*, 320 Or. 233, 881 P.2d 795, 810 (Or.1994) (Unis, J., dissenting); Paul Shunatona and Tricia Tingle, *Indian Child Welfare Act in Texas—An Overview*, 58 Tex. B.J. 352, 355 (1995) (stating that ICWA best interest standard is drastically different than the state test set by the Texas Supreme Court). Under the ICWA, what is best for an Indian child is to maintain ties with the Indian Tribe, culture, and family. *Quinn*, 881 P.2d at 810 (citing *Holyfield*, 490 U.S. at 50 n. 24, 109 S.Ct. at 1609 n. 24). By using the best interest of the child standard employed by state courts in cases involving non-Indian children, the Indian court engaged in the type of analysis that created the need for the Act in the first place.

We decline to follow the holdings in the cases adopting the best interest test and, instead, join those states that have rejected the use of the best interest standard as a consideration for good cause. *See In re J.L.P.*, 870 P.2d 1252, 1258 (Colo.Ct.App. 1994); *In re Armell*, 194 Ill.App.3d 31, 141 Ill.Dec. 14, 550 N.E.2d 1060 (Ill.App.Ct.1990), *appeal denied*, 132 Ill.2d 545, 144 Ill.Dec. 255, 555 N.E.2d 374 (Ill.1990), *cert. denied*, 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990); *In re B.W.*, 454 N.W.2d 437 (Minn.Ct. App.1990); *In re C.E.H.*, 837 S.W.2d 947, 954 (Mo.Ct.App.1992); *In re Ashley Elizabeth R.*, 116 N.M. 416, 863 P.2d 451, 456 (N.M.Ct. App.1993). We find that the cases refusing

11. Once author notes a third reason for not considering the best interest standard under section 1911(b): even within the Anglo–American legal system, the standard is regarded as flawed because it is so imprecise. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act*, 79 Iowa L.Rev. 585, 615 (1994).

to use the best interest standard reflect the correct interpretation, and properly implement the goals, of the ICWA.

Our holding is predicated on two distinct reasons. First, the use of the best interest standard when determining whether good cause exists defeats the very purpose for which the ICWA was enacted, for it allows Anglo cultural biases into the picture. Second, the best interest test is relevant to issues of placement, not jurisdiction.

■■■ As the historical context of the Act shows, the Act was specifically directed at preventing the infiltration of Anglo standards, standards which created the outrageous situation of child welfare agencies and state courts removing Indian children from the stability of their tribes and families. The ICWA precludes the imposition of Anglo standards by creating a broad presumption of jurisdiction in the tribes. Thus, the jurisdictions provisions in sections 1911(a) and (b) are at the very heart of the ICWA. We decline to embrace a test that would, in our judgment, eviscerate the spirit of the Act.

■■■ Secondly, we reject the best interest standard because it is relevant to issues of placement, not jurisdiction. *In re Armell,* 141 Ill.Dec. at 19, 550 N.E.2d at 1065; *In re C.E.H.,* 837 S.W.2d at 954. The only issue in cases involving motions to transfer is the determination of the proper tribunal to resolve the custody issue. Thus, the question of whether a parent or guardian is abusive, neglectful, or otherwise unfit is irrelevant at this point. For a court to use this standard when deciding a purely jurisdictional matter, alters the focus of the case, and the issue becomes not what judicial entity should decide custody, but the standard by which the decision itself is made. The utilization of the best interest standard and fact findings made on that basis reflects the Anglo–American legal system's distrust of Indian legal competence by its assuming that an Indian determination would be detrimental to the child. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act,* 79 Iowa L.Rev. 585, 628 (1994). The underlying assumption is that relying on an Indian determination of best interest would not truly result in what is best for the Indian child. *Id.* We view this as an arrogant idea that defeats the sovereignty of Indian tribes in custody matters; the very idea for which the ICWA was enacted.

Our interpretation of the Act and rejection of the best interest standard is supported by language in the Supreme Court's *Holyfield* decision. In that case, twins, born of parents enrolled as members of the Mississippi Band of Choctaw Indians (the Tribe) and residents of the Choctaw reservation, were born off the reservation. *Holyfield,* 490 U.S. at 37, 109 S.Ct. at 1602. The mother and father executed a consent to adoption form and the children were adopted by the Holyfields. *Id.* at 37–38, 109 S.Ct. at 1602–03. The Tribe moved to vacate the adoption and claimed jurisdiction under section 1911(a) of the ICWA. The case worked its way through the Mississippi state courts and finally to the U.S. Supreme Court. This took approximately three years, and during this time, the twins were with the Holyfields. Though dealing with section 1911(a) and the question of "domicile," the Supreme Court used language that is extremely relevant and instructive to the case before us. After deciding that jurisdiction rested with the Tribe, the Court stated:

> We are not unaware that over three years have passed since the twin babies were born and placed in the Holyfield home, and that a court deciding their fate today is not writing on a blank slate in the same way it would have in January 1986.

> \* \* \* \* \* \*

> Whatever feeling we might have as to where the twins should live, however, it is not for us to decide that question. We have been asked to decide the legal question of *who* should make the custody determination concerning these children—not what the outcome of that determination should be. The law places that decision in the hands of the Choctaw tribal court.

*Id.* at 53, 109 S.Ct. at 1611 (emphasis in the original).

Here, like in *Holyfield,* the question is who should make the custody determination, not what the ultimate outcome should be. Thus,

questions of best interest are irrelevant at this time because the placement of the children was not before the court. We hold that the best interest standard is not an appropriate consideration in a determination of whether good cause exists to deny a transfer of jurisdiction to a tribal court. As long as state courts allow placement principles such as "best interests" to creep into a purely jurisdictional decision, the best interest standard will facilitate the judicial behavior that necessitated the ICWA in the first place. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act,* 79 Iowa L.Rev. 585, 629 (1994). We decline to add Texas to the list of states that hold the "best interest" standard can prevent transfer. We, therefore, sustain relator's contention that the trial court abused its discretion in considering the best interests of the children.

In its third contention, relator contends the trial court abused its discretion in considering the lack of contact between the children and the Tribe as good cause for denying the transfer. We agree.

When the original version of the Guidelines was published, one of the circumstances included in the determination of good cause was whether the child had little or no contact with his or her Indian tribe for a significant period of time. *BIA Guidelines,* 44 Fed.Reg. at 67,591. The comments on the inclusion of lack of contact as a reason to deny transfer was critical. Its inclusion was criticized, and rightly so, because it would have essentially excluded transfers of any Indian child born off the reservation. *Id.* Those who favored eliminating lack of contacts from the good cause criteria argued that Indian tribes still had a legitimate interest in the welfare of members who did not have previous significant contact with the tribe or the reservation. They also claimed that this criteria invited the state courts to make the kind of cultural decisions that the Act contemplated should be made by Indian tribes. *Id.*

Ultimately, the original version of the good cause factors was amended and the "lack of contacts" criteria was significantly altered and now reads:

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

\* \* \* \* \* \*

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

*Id.*

The commentary to this provision recommends that state court judges not be called upon to determine whether a child's contacts with the tribe are so limited that the case should not be transferred. This decision can be made by the parents of the child who have veto power over the decision to transfer. 25 U.S.C.A. § 1911(b) (1983). Only when a parent is not available and the child is over five years of age should a state court intervene and make a determination involving lack of contact with the tribe. We find the Guidelines and the commentary persuasive. In fact, the reasoning for excluding lack of contact as a basis for denying transfer is in line with our reasoning in excluding the best interest test.

In the case before us, each child has at least one parent available to veto any transfer; Mark and Matthew have both parents available. Further, at the time of the hearing, only Michael was over the age of five. Therefore, the lack of contact with the Tribe was not a factor the trial court should have considered in making its good cause determination. We hold that the trial court, under these facts, abused its discretion in considering the children's lack of contact with the Tribe as a basis to deny the transfer. Relator's third contention is sustained.

Lastly, relator asserts that the trial court abused its discretion by finding that White was a "parent" with the power to object to the transfer as to Mark and Matthew. Relator argues that the trial court misinterpreted the ICWA and gave an unwed father the right to object as a parent.

Section 1911(b) gives either parent the right to object to the transfer of the child custody proceeding to the tribal court. The ICWA defines a parent as any biological

parent or parents of an Indian child, or any Indian person who has lawfully adopted an Indian child. 25 U.S.C.A. § 1903(9) (1983). The ICWA specifically excludes from that definition "the unwed father where paternity has not been acknowledged or established." *Id.* Relator claims that White is such a father.

Relator bases its argument on the language contained in section 1903(9) and claims that because the language is in the past tense, "has not been acknowledged or established," that White had to have acknowledged or established his paternity prior to the filing of the motion to transfer. Thus, relator claims that White cannot object to the transfer because he failed to acknowledge or establish his paternity in a timely manner.

The ICWA provides no express standards with respect to how an unwed father can acknowledge or establish paternity. Furthermore, the Guidelines do not address this issue. The only manifestation of the legislative intent behind the Act's definition of "parent" is in the House Report on the Act. The report states that the qualification of an unwed father's right "is not meant to conflict with the decision of the Supreme Court in *Stanley v. Illinois*, 405 U.S. 645, [92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ]." *In re Adoption of a Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925, 934 (N.J.1988) (quoting H.R. REP No. 1386, 95th Cong., 2d Sess. 9, 21 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531). Thus, we must review the *Stanley* decision and those following it to determine what Congress meant by "acknowledged or established."

▪ In *Stanley*, an unwed father whose children, upon the mother's death, were declared wards of the state, challenged the Illinois law that allowed the state to separate Stanley from his children without a hearing. 405 U.S. at 646–47, 92 S.Ct. at 1210–11. The Supreme Court held that a blanket denial of parental rights to all unwed fathers, regardless of fitness, violated the due process clause. *Id.* at 657–58, 92 S.Ct. at 1215–16. Over the next several years, the Supreme Court heard a number of cases and sought to define under what circumstances a state could deny an unwed father parental status. The result of these decisions makes it clear that a state cannot deny parental rights to an unwed father who has established a substantial or sustained relationship with his children. *See Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (holding that parental rights could be denied to unwed father who failed to establish substantial relationship with child); *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (holding that unwed father who sustained relationship with children was entitled to constitutional protection); *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511, *reh'g denied*, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978) (holding that unwed father who manifested limited interest in children was not entitled to constitutional protection).

▪ Thus, it is clear that while parental rights do not exist merely by virtue of a biological connection, they do exist when there is an existing relationship between parent and child. *Lehr*, 463 U.S. at 260, 103 S.Ct. at 2992–93. In light of these holdings, a state may constitutionally deny an unwed father parental status only if he fails to manifest an interest in developing a relationship with his child. *In re Adoption of a Child of Indian Heritage*, 543 A.2d at 934. After the Supreme Court's decision in *Stanley*, many states adopted statutes defining the circumstances under which a man would be presumed to be a child's father, and thus, entitled to due process in any proceeding involving the child. *Id.*

The Texas Family Code is representative, presuming a man to be a child's father if, for example, he has married the mother and the child is born during the marriage or not more than 300 days after the marriage is terminated; he consents to be named as the father on the birth certificate; or he takes the child into his home and openly holds that child out as his biological child. *See* TEX. FAM.CODE ANN. § 12.02(a)(1), (4), and (5) (Vernon Supp.1995).[12] Section 12.02 also

---

**12.** On April 20, 1995, the Texas Legislature recodified the Texas Family Code by reenacting Title 2 and adding Title 5. Act of April 20, 1995, ch. 20, § 1, 1995 Tex.Sess.Law Serv. 113 (Vernon).

provides that any presumption under this section may be rebutted only by clear and convincing evidence. TEX.FAM.CODE ANN. § 12.02(b) (Vernon Supp.1995). The laws in other states are similar. *In re Adoption of a Child of Indian Heritage*, 543 A.2d at 934. Further, under Texas law, a man may execute a voluntary statement of paternity and file a petition for a decree adjudicating him as a parent of the child. TEX.FAM.CODE ANN. § 13.21(a) (Vernon Supp.1995).[13] A statement of paternity executed according to the requirements of the Family Code is prima facie evidence that the child in question is the child of the person executing the statement. TEX.FAM.CODE ANN. § 13.23(a) (Vernon 1986).[14]

The developments in the law regarding the rights of unwed fathers were occurring contemporaneously with the events leading up to the enactment of the ICWA, and appear to be reflected in the Act. *In re Adoption of a Child of Indian Heritage*, 543 A.2d at 935. Instead of adopting a uniform rule recognizing all biological parents as "parents" under the ICWA, Congress included a definition that excludes unwed fathers who have not taken steps to ensure that their relationship with the child would be recognized. *Id.* This approach is consistent with the development of state law resulting from the Supreme Court's decision in *Stanley. Id.* As a result of the definition in the Act and the failure of the Act or the Guidelines to define methods for determining whether a father has acknowledged or established his paternity, we find, as did the New Jersey Supreme Court, that Congress intended to have the issue of acknowledgement or establishment of paternity determined by state law. *See id.* (concluding Congress intended to defer to state or tribal standards for es-

tablishing paternity, as long as standards were within contemplation of Congress and provide realistic opportunity for unwed father to establish relationship with child).

The procedures in the Texas Family Code provide more than an adequate means for determining whether an unwed father has established or acknowledged his paternity. We hold for the following reasons that White did establish or acknowledge his paternity according to the requirements of Texas law, and thus, within the contemplation of the ICWA.

First, White has filed a claim for voluntary paternity under section 13.21 of the Texas Family Code and executed a statement of paternity pursuant to section 13.22. In his statement, White swears that he is the biological father of Mark and Matthew and that no other man is the father. Under Texas law, this is prima facie evidence that White is the biological father of Mark and Matthew and that he has an obligation to support them. *See* TEX.FAM.CODE ANN. § 13.23(a) (Vernon 1986). This is clearly an "acknowledgement" of paternity within the requirements of the ICWA.

Relator does not dispute the fact that White acknowledged his paternity of Mark and Matthew; however, it argues that White acted too late based on the language used in the Act. We disagree with relator's interpretation. Relator claims that because the Act uses the past tense, "has not been acknowledged or established," the unwed father must take the necessary action before the Indian tribe files a motion to transfer. The ICWA does not set forth any time limits in which an unwed father must establish or acknowledge his paternity. The motion to transfer is the opening volley in any custody proceeding involving an Indian child. In

---

This recodification was effective immediately. *Id.* at 282. Under the recodification section 12.02 now appears in chapter 151, section 151.002. *Id.* at 138. A proceeding pending on the effective day of the Act is governed by the law in effect at the time the proceeding was commenced. *Id.* at 282. The present proceeding was commenced before April 20, 1995, and is, therefore, subject to the Family Code provisions in effect before recodification. Further, the Texas Legislature made no substantive changes when it recodified section 12.02. *See id.* at 138.

**13.** This section was also recodified and now appears in chapter 160, section 160.201. Act of April 20, 1995, ch. 20, § 1, 1995 Tex.Sess.Law Serv. 113, 211 (Vernon).

**14.** As recodified, this section now appears in chapter 160, section 160.201. Act of April 20, 1995, ch. 20, § 1, 1995 Tex.Sess.Law Serv. 113, 212 (Vernon).

fact, it is a precursor to any other action in a child custody proceeding. To hold that an unwed father must act before that time or forever be prohibited from attaining parental status would dissuade such actions by biological fathers. This could not be what Congress envisioned.

The only case we have found that addresses the definition of parent and contains a detailed analysis of the law is *In re Adoption of a Child of Indian Heritage.* In this case, the New Jersey Supreme Court was asked by the unwed father of an Indian child to vacate an adoption because the adoption proceedings did not comply with state law of the ICWA. *In re Adoption of a Child of Indian Heritage,* 543 A.2d at 927. Specifically, the father claimed that he did not get notice pursuant to the provisions of section 1912(a). *See* 25 U.S.C.A.1912(a) (1983) (stating that in any state court proceeding involving an Indian child, party seeking foster care placement or termination of parental rights must notify the parent of the proceeding and the right of intervention). Thus, the court had to determine whether the father was a "parent" under the ICWA in order to decide whether he was entitled to notice. *In re Adoption of a Child of Indian Heritage,* 543 A.2d at 933.

The New Jersey court reviewed *Stanley,* other Supreme Court cases concerning unwed fathers, and the requirements for acknowledgement or establishment of paternity under New Jersey law. *Id.* at 934–36. The court concluded that the father failed to establish any of the presumptions of parenthood provided under New Jersey law. *Id.* at 936. They also found that there was no indication that the father ever filed a written acknowledgement of paternity, or initiated a suit claiming paternity or any other parental rights prior to the final judgment of adoption. *Id.* (emphasis added). Further, the father never sought to enter his name on the child's birth certificate. *Id.*

The court held that any unwed father concerned about protecting his parental rights would have taken one or more of the steps discussed upon discovering that the child had been placed for adoption. *Id.* Thus, the court held that because the father failed to acknowledge or establish his paternity of the child prior to entry of the final judgment of adoption, and in fact, took no such action until a year later, his acknowledgement of paternity was not timely within the contemplation of the ICWA. *Id.* at 936–37.

In the case before use, White legally acknowledged his paternity and sought court sanction of that acknowledgement as soon as there was any question about his rights as a parent over the lives of Mark and Matthew. In view of the events that were occurring at the time the ICWA was passed, and the reference to *Stanley* in the House Report, we do not accept that Congress intended to exclude unwed fathers from the definition of "parent" from the moment any action is taken by an Indian tribe concerning child custody if the fathers have not yet formally established or acknowledged their paternity. The construction of section 1903(9) suggested by relator would tend to further erode the family unit at a time when this country and Indian tribes are involved in a struggle to maintain the integrity of the family.

■ Even if we accept the interpretation propounded by relator, we find that White is still a "parent" with the right to veto any transfer under section 1911(b). Section 12.02(a)(5) provides that a man is presumed to be the biological father of a child if he receives the child into his home and openly holds out the child as his biological child. TEX.FAM.CODE ANN. § 12.02(a)(5) (Vernon Supp.1995). This presumption may only be rebutted by clear and convincing evidence. TEX.FAM.CODE ANN. § 12.02(b) (Vernon Supp. 1995).

■ The record before this court reflects that until the children began living with the real parties in interest, they lived with White and their biological mother, Johnson. White and the mother had been living together even before the birth of the two youngest boys. White represented to his family that Mark and Matthew were his children and they were accepted as White's sons. In fact, the parties attempting to obtain custody of the boys are relatives of White. The evidence clearly shows that White received Mark and Matthew into his home and held them out to be his natural children. Thus,

under Texas law, White is presumed to be the biological father of the two boys. *See* TEX.FAM.CODE ANN. § 12.02(a)(5) (Vernon Supp.1995). This state law presumption is sufficient to demonstrate acknowledgement or establishment of paternity under section 1903(9) of the ICWA.[15] *See In re Adoption of a Child of Indian Heritage*, 543 A.2d at 934–36.

We hold that the trial court did not abuse its discretion in finding White to be a "parent" under the ICWA. As the parent of Mark and Matthew, he was authorized to object to any transfer of the proceedings on their behalf. We overrule relator's contention based on the trial court's ruling that White is a "parent" under the ICWA.

We recognize, however, that White is not the father of Michael; Michael's father is unknown. Therefore, White cannot object to a transfer of the proceedings as they relate to Michael. Notwithstanding White's inability to object as to Michael, we note that Johnson, Michael's mother, did implicitly object to the case concerning Michael being transferred to the tribal court if the proceedings as to Mark and Matthew were not transferred.

The trial court found that Johnson was opposed to any separation of the three children. This finding was made based on Johnson's testimony in the hearing on the motion to transfer. Because the motion to transfer was the only issue properly before the trial court, it can be effectively argued that Johnson objected to any transfer involving Michael in the event the court retained jurisdiction of Mark and Matthew. There is no

dispute that Johnson is the mother of Michael, and thus, a "parent" under the ICWA. This issue was not specifically raised by the parties before the trial court and the trial court did not make a finding that Johnson objected to the transfer. We comment only because of the trial court's findings and the fact that the attorney for the real parties in interest raised it at oral argument.

## CONCLUSION

We hold that the trial court did not abuse its discretion in refusing to transfer the case to the Yavapai–Apache tribal court. The trial court did not abuse its discretion in finding good cause to deny the transfer based on the modified forum non conveniens doctrine, or in finding that White was a parent with the power to object to a transfer of the proceedings as they relate to Mark and Matthew. The trial court did abuse its discretion in considering the best interests of the children and the children's lack of contact with the tribe; however, the findings that were appropriate were sufficient to deny the transfer.[16] We deny relator's petition for writ of mandamus.

EDELMAN, J., concurs in the result only.

---

15. We note also that White is listed as the father of Mark and Matthew on their birth certificates. Because there is nothing in the record to show that White consented in writing to having his name placed on the birth certificates, he cannot be presumed to be the father under section 12.02(a)(4) of the Texas Family Code. However, we do view the fact that he is listed on the birth certificates as more evidence that White did acknowledge his paternity of Mark and Matthew early on, and should not be excluded from the definition of "parent" contained in the ICWA.

16. It is important to understand that when the state court chooses to retain a case based on good cause in a concurrent jurisdiction context, it does not categorically follow that the state

court's purpose is to apply the Anglo–American best interest of the child test. When a state court keeps a case in a concurrent jurisdiction setting, it is still required to apply the relevant sections of the ICWA. In other words, avoiding tribal court jurisdiction does not render the ICWA inapplicable. Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test*, 27 GONZ. L.REV. 353, 359 (1991–92). *See also In re Appeal in Pima County*, 130 Ariz. 202, 635 P.2d 187, 189 (Ariz.Ct.App.1981), *cert. denied by Catholic Social Services of Tucson v. P.C.*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); Note, *Indian Child Welfare: A Jurisdictional Approach*, 21 ARIZ. L.REV. 1123, 1123 (1979).