cv5-706.dd.hughes 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00706-CV







Jill Enderli Hughes, Appellant



v.



Charles Jackson Hughes, Appellee







FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 340TH JUDICIAL DISTRICT


NO. C-94-0240-F, HONORABLE JOHN E. SUTTON, JUDGE PRESIDING







PER CURIAM


 Jill Enderli Hughes appeals the decree dissolving her marriage to Charles Jackson Hughes. 
She primarily challenges the child custody determination, but also challenges some of the property division. 
We will affirm the judgment.

 The couple married on December 7, 1985. They had children in 1986 and 1990. Jill and
the children lived in San Angelo, Texas, before moving to Baytown on February 28, 1994. Charles lived
with them in San Angelo until moving to Dallas for most of the time he attended law school from August
1991 until February 1994; he spent the summer of 1992 attending school in Oxford, England. Charles did
not see Jill or the children from Thanksgiving 1993 until after taking the bar exam in February 1994. Jill
filed her petition for divorce in San Angelo on March 2, 1994. The trial was held in November 1994, and
the decree of divorce was signed on August 11, 1995. The children primarily remained with Jill in Baytown
during the pendency of the suit, but had some extended visits with Charles.

 The court did not sign the decree of divorce until nine months after the nonjury trial in
November 1994. The court established a joint managing conservatorship of the children, but awarded to
Charles the primary right of possession. On August 24, Jill requested findings of fact and conclusions of
law, and on September 8 moved for new trial and recusal of the district judge. Jill filed a notice of past due
findings and conclusions on September 22. Following the denial of the motion for recusal on October 28,
the court signed the findings of fact and conclusions of law on November 7.

 By point of error two, Jill contends that the trial court failed to make findings of fact and
conclusions of law. However, the court made findings and conclusions and they are in the transcript. In
her discussion, Jill complains about the absence of findings of fact regarding why giving Charles primary
right to possess the children better served the children's best interest. Jill waived her right to complain on
appeal of the absence of particular findings by failing to request those additional findings pursuant to Tex.
R. Civ. P. 298. Dallas Morning News Co. v. Board of Trustees of Dallas Indep. Sch. Dist., 861
S.W.2d 532, 538 (Tex. App.--Dallas 1993, writ denied). We find no reversible error and overrule point
two.

 By point of error four, Jill contends that the court erred by allowing Charles the primary
right to possession of the children. She complains that he had no meaningful existing relationship with the
children and that there was no evidence that a change in their primary residence was in the best interest of
the children. We note that, aside from the temporary orders, this is the first custody and possession
determination, not a modification of existing orders.

 In determining conservatorship, possession, and access to the child, the trial court's primary
consideration is always the best interest of the child. Tex. Fam. Code Ann. § 153.002 (West 1996). 
Texas's stated public policy is to encourage parents to share in the rights and duties of raising their child,
to provide a stable environment for the child, and to assure that children will have frequent and continuing
contact with parents who have shown the ability to act in the best interest of the child. Code § 153.001. 
The trial court has wide latitude in deciding custody matters; we will reverse only when the record shows
an abuse of discretion. Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982). The test is not whether
we agree with the decision, but whether the court has acted unreasonably, arbitrarily, or without reference
to any guiding principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).

 Factors that courts have considered include the desires of the children, the children's
emotional and physical needs, the parents' parenting abilities, programs to assist parents, the parents' plans
for the children, the stability of the home, the acts and omissions of the parents, and excuses for those acts
and omissions. See Yavapai-Apache Tribe v. Mejia, 906 S.W.2d 152, 168 (Tex. App.--Houston [14th
Dist.] 1995, orig. proceeding).

 There was no direct evidence of the children's desires. Jill complains by point of error three
that the trial court should have generated such evidence by appointing a guardian ad litem for the children
or interviewing the children about their wishes. These actions were not required or requested by any party
at trial. Neither child is twelve years old, so they were not entitled to file a choice of conservator with the
court. Code § 153.008. The court was not required to interview the children in chambers. Code §
153.009(b) (may interview child under twelve years old). Nor was the court required to appoint a
guardian ad litem. Code § 107.001(b) (may appoint guardian ad litem); see also Code § 107.011 (shall
appoint attorney ad litem when court deems representation necessary to protect interests of child);
Code § 107.012 (appointment mandatory in cases terminating parent-child relationship). We overrule
point three.

 The testimony indicated that both parents could provide reasonably well for the children's
emotional and physical needs. Both had family members nearby who could assist them with child-rearing. 
Though the children had lived in San Angelo all but the eight months preceding the trial, they had visited
their grandparents in Baytown often. The children had lived in Baytown almost a year-and-one-half by the
time the decree was signed. There were no signs of physical or mental abuse of the children; there were
allegations that Charles physically threatened Jill on occasion and that Jill was domineering to Charles. 
Charles retained the family home where the children had lived in San Angelo, while Jill was living with her
parents pending the outcome of the lawsuit.

 Charles was relatively inexperienced in being the children's primary caregiver. While Jill
had lived with the children for their entire lives, Charles had been largely absent for almost three
years--most of the younger child's life--while attending law school and then for the months after the
children moved to Baytown. When Charles came to San Angelo during law school, Jill often had taken
the children to Baytown; though Charles's witnesses felt that Jill intentionally timed her departures, only one
witness said she was certain the missed connections were deliberate on Jill's part. In December 1993,
Charles visited San Angelo at Christmas after law school graduation, but the children went to Baytown with
Jill to be with her critically injured grandfather; Charles returned to Dallas to start a bar-review program
three days after Christmas without going to Baytown or seeing the children. Following the separation, he
kept both children for a one-week period and a three-week period. 

 Despite his inexperience, he apparently kept a tight rein on the children (e.g., not letting
them run around a restaurant or eat with their hands), but most witnesses could not be certain whether the
improvement in their behavior was due to his involvement, the children's natural maturation, or even Jill's
instruction. Many witnesses testified that Charles was patient and loving with the children and that the
children seemed happy with him. The witnesses agreed that Jill loved and cared for her children, but
questioned her ability to discipline them.

 Accounts surrounding the older child's unexplained refusal to go to San Angelo for the
second three-week summer visit in 1994 were somewhat troubling. According to Jill, Charles was angry
and mean when the child refused; by contrast, he recalled simply that he did not want to force the child to
come with him against her will. Jill said that, shortly after arriving in San Angelo, Charles vindictively got
the younger child to call the older child to tell of the many toys he had received for coming on the visit. At
the end of the visit, when Jill travelled to pick up the younger child, she arrived early without telling Charles
that she and the elder child were in town.

 Charles expressed a clearer plan for the children's future than Jill did, partly because it was
a resumption of their lives in San Angelo; they would live in the same house and the elder child would return
to her school and familiar activities such as soccer and scouts. Charles had a steady income and a newly
acquired profession; Jill had no existing employment and a history of entry-level, low-wage jobs. Jill's plan
for the children, including where they would live, hinged on the outcome of the divorce; eight months after
leaving San Angelo she had no income (except for child support) and she and the children lived with her
parents and brother. The elder child had begun some activities in Baytown, playing soccer and attending
school. 

 Jill had had great trouble getting the elder child to school on time in San Angelo; the child's
report cards listed sixteen-and-one-half absences and thirty tardies during first grade, and Charles testified
that the child had been tardy ninety times in second grade.

 Charles apparently made a greater effort to include Jill and her family when he had the
children than vice versa. Though Jill faithfully kept appointments for Charles's visitation, aside from these
visits, weeks and months might go by without contact with Charles and his family when Jill had the children;
sometimes when Charles called to speak with the children, he was told they were too busy playing to speak
with him. When Charles had the children, however, they called not only Jill but her parents and other
relations.

 The record contains evidence to support a wide range of custody arrangements, including
the one ordered. Even though Charles was with the children on a limited basis in recent years, we cannot
say that the court abused its discretion by giving Charles the primary right to determine the children's
residence. We overrule point four.

 By point of error one, Jill contends that the court's eight-month delay before signing the
decree deprived her of due process and a fair trial by preventing her from cross-examining or challenging
witnesses or evidence about Charles's attempts to develop a parental relationship with the children. She
bases her complaint on the trial judge's statement during the recusal hearing that, though he tentatively
decided at the end of the trial to award Charles primary possession, he waited to announce his decision
to ease the transition for the children. If the judge had announced the custody arrangement and made it
effective when he made the decision, the children faced a sudden change of residence during a school year;
if he had announced the arrangement upon making the decision, but made it effective at the end of the
school year, he would have caused an awkward, extended period of time with the parent not awarded
primary right to possession. The judge said he wanted to avoid both scenarios. Jill complains that the
judge used the eight-month period to allow Charles to establish a relationship with the children after the
trial. She claims that this constituted development of evidence and witnesses she could not challenge or
cross-examine.

 Even if we accept her allegations, we cannot hold that the trial court's delay constituted
reversible error. Because the evidence adduced at trial before the controversial transition period provided
support for the court's ruling, we must hold that the court acted within its discretion to award Charles the
power to determine the children's residence. Although a trial court should not unnecessarily delay rendering
a custody decision, we cannot find reversible error in the trial court's allowing the children to stay eight
more months with their mother before changing their residence.

 Jill also intimates that the judge used this procedure because he was biased in favor of
Charles, as shown by Charles winking at the judge during testimony and the judge swearing Charles in to
the bar. First, these complaints are properly the subject of the motion to recuse, which was overruled and
not appealed. Second, a judge swearing in a new attorney as part of a group of new attorneys does not,
without more, demonstrate favoritism toward that attorney. Finally, the record clearly reflects that the court
sternly criticized Charles for winking at him and for being a poorly prepared witness. We find no evidence
of bias by the court that made the eight-month delay a deprivation of due process and fair trial. We
overrule point one.

 By point of error five, Jill contends that the trial court erred in decreeing that she must pay
$160 per month in child support, pay for the children's health insurance if such is available through her
employer, and pay the $18,158 credit-card debt. She contends that this division of property and
obligations was grossly unfair given the comparative financial status and earning ability of the parties. She
further contends that no evidence supported that the division was equitable or just. We review the support
order and property division for abuse of discretion. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex.
1990) (child support); Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987).

 Jill contends that the court should not have required her to pay these sums because Charles
testified that he did not need her money. She complained that she had no income, had not worked outside
of the home since their marriage, and had expenses of $1,130 per month. She contends that Charles's
income from his law practice and his separate property make him much stronger financially than she to
shoulder the financial burden of raising the children.

 Texas public policy favors parents sharing the duties of raising their children, including
financial support, after the divorce. The statutory presumption is that the party not in possession of the
children will pay twenty-five percent of her net monthly resources. See Code § 154.125. Reconstructing
the court's calculations, the $160 payment is based on net resources of $640, or gross wages of $730. 
That gross corresponds to twenty-one-and-a-half eight-hour days per month at $4.25 per hour, the
minimum wage at the time of trial. Jill testified that she can hold a minimum-wage job. Her expenses will
fall from the $1,130 claimed because that included expenses incurred in being the children's primary
custodian. The insurance obligation arises only if insurance is available through her employment. We find
no abuse of discretion in the award of child support.

 While the credit card debt was not solely accrued by Jill, it was the only debt assigned to
her. Charles was assigned several debts incurred by the parties during marriage: the farm-credit note
($118,032), his law-school loan from his mother ($90,000), two years' income-tax liability ($12,475), and
property tax debt. The court found that the net value of the community estate awarded to Jill was negative
$14,158, while the net value of the community estate awarded to Charles was negative $173,163. Though
the decree indicates that Charles had vastly greater separate property wealth, the division of the
community property and debts appears to take that into account and does not appear grossly unfair to Jill. 
We find no abuse of discretion. We overrule point five.

 Because we find no error, we affirm the judgment.


Before Chief Justice Carroll, Justices Kidd and B. A. Smith

Affirmed

Filed: November 13, 1996

Do Not Publish



nt-family: CG Times"> Even if we accept her allegations, we cannot hold that the trial court's delay constituted
reversible error. Because the evidence adduced at trial before the controversial transition period provided
support for the court's ruling, we must hold that the court acted within its discretion to award Charles the
power to determine the children's residence. Although a trial court should not unnecessarily delay rendering
a custody decision, we cannot find reversible error in the trial court's allowing the children to stay eight
more months with their mother before changing their residence.

 Jill also intimates that the judge used this procedure because he was biased in favor of
Charles, as shown by Charles winking at the j